

DA 08-0016

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 415

RANDALL G. KNOWLES,

        Petitioner and Appellee,

  v.

STATE OF MONTANA, ex rel.
MONICA J. LINDEEN, Montana State Auditor
and Ex Officio Commissioner of Securities,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDV-2006-1024
Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Roberta Cross Guns, Montana State Auditor's Office, Helena, Montana

        For Appellee:

            Stanley T. Kaleczyc, Brand G. Boyar, Browning, Kaleczyc, Berry
& Hoven, P.C., Helena, Montana

                Submitted on Briefs:  October 16, 2008

                        Decided:  December 2, 2009

Filed:

             _____
                          Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 "It requires but little appreciation . . . of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail in every facet of the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186-87, 84 S. Ct. 275, 280 (1963) (ellipsis in *Capital Gains*, internal quotation marks omitted). The Securities Act of Montana, set out in Title 30, chapter 10, parts 1 through 3 of the Montana Code Annotated, serves to achieve this goal. First enacted in 1961, the Act is a substantial adoption of the major provisions of the Uniform Securities Act promulgated by the Conference of Commissioners on Uniform State Laws, though it contains some variations, omissions, and additional matter. *See* Chapter Compiler's Comments, Title 30, chapter 10, MCA (Annotations 2008). Like federal securities statutes, whose "fundamental purpose . . . was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry," *Capital Gains*, 375 U.S. at 186, 84 S. Ct. at 280, the Securities Act of Montana is intended to protect the investor, persons engaged in securities transactions, and the public interest. *See* § 30-10-102(1), MCA. The Act also seeks to promote uniformity among the states and to encourage, promote, and facilitate capital investment in Montana. *See* § 30-10-102(2), (3), MCA.

¶2 The administration of the Securities Act is under the general supervision and control of the State Auditor, who is the ex officio Commissioner of Securities and Insurance. *See* §§ 2-15-1901, 2-15-1903, 30-10-107(1), MCA. The Commissioner is authorized to make, amend, and rescind rules and forms as necessary to carry out the

2

Act's provisions. Section 30-10-107(1), MCA. The State Auditor's office consists of several divisions, including a Securities Department, which is headed by the Deputy Securities Commissioner. Admin. R. M. 6.1.101(1)(c). The Department is responsible for administering the Securities Act; and, to that end, the Department registers securities offered for sale in Montana, broker-dealers, salespersons, investment advisers, and investment adviser representatives. Admin. R. M. 6.1.101(2)(a). The Department also serves an enforcement function. Admin. R. M. 6.1.101(2)(a).

¶3 In August 2004, the Department issued a Notice of Proposed Agency Disciplinary Action and Opportunity for Hearing, alleging that Randall G. Knowles had violated various provisions of the Securities Act. The Department subsequently amended the Notice to include additional violations alleged to have occurred during the pendency of these proceedings. The Department proposed that the Commissioner impose fines for each of the violations and that Knowles' pending application for registration as a securities salesperson be denied.

¶4 The case proceeded to a contested case hearing in March and April 2005, and the Commissioner (John M. Morrison at the time) issued the final agency decision in May 2006. He concluded that Knowles had in fact violated §§ 30-10-201(1), -201(13)(g), and -301(1), MCA. Furthermore, the Commissioner concluded that Knowles' failure to comply with the Securities Act was "willful" under § 30-10-201(13)(b), MCA. He imposed fines totaling $20,000. Knowles then filed a petition for judicial review in the Eighth Judicial District Court, Cascade County. The District Court held a hearing and, in August 2007, issued an order reversing the Commissioner's decision. The Department

now appeals. Having examined the District Court's order and the complete record, we affirm in part and reverse in part.

**BACKGROUND**

**Underlying Factual and Procedural Events**

¶5 With exceptions not applicable here, it is unlawful for a person to transact business in this state as a broker-dealer, salesperson, investment adviser, or investment adviser representative unless the person is registered under the Securities Act. Section 30-10-201(1), (3), MCA. As the Department's expert explained during the contested case hearing, the registration requirement is designed to ensure that individuals who are assisting people in the management of their money have the requisite knowledge and skill and are familiar with the applicable laws. To that end, registration requires the passage of specific exams, *see e.g.* Admin. R. M. 6.10.501, and then ongoing compliance with the Securities Act, *see e.g.* § 30-10-201(13), MCA, and certain other requirements, such as continuing education. Moreover, with respect to salespersons, their registration is not effective during any period when the salesperson is not associated with a securities issuer or a registered broker-dealer specified in the registration application. *See* § 30-10-201(10)(a), MCA. In other words, the salesperson must be sponsored by an issuer or a broker-dealer in order to become registered. An analogous requirement applies to investment adviser representatives. *See* § 30-10-201(10)(b), MCA.

¶6 At the time the Department filed the violations against Knowles (August 2004), he had been in the securities business for about 18 years. During that time, Knowles served hundreds of clients and was an active member in various organizations, including the

4

National Association of Insurance and Financial Advisors (NAIFA). Knowles is highly educated and served as a continuing education instructor for NAIFA for several years. He was registered as an investment adviser representative until December 31, 2003, and as a securities salesperson until June 7, 2004.

¶7 The Securities Act violations at issue here arose out of an ongoing arrangement Knowles had with Mark Payton. At the time, Payton was licensed to sell annuities and Knowles was a registered securities salesperson with FSC Securities Corporation (FSC). Payton would meet with prospective clients to sell annuities issued by the life insurance company Payton represented. He would carry with him securities transaction forms provided by Knowles, including confidential personal financial planning forms, change of investment objectives forms, account transfer forms, and durable power of attorney forms. These forms would be filled out and signed if securities could be liquidated to fund the purchase of an annuity from Payton. Payton then would send the completed forms to Knowles, who would use them to effectuate the securities transaction.

¶8 In 2002, Payton met with Grace Simmons, Emily Downey, and Doris Haaland. At the time, Simmons was 81 years old, Downey was 68, and Haaland was 71. It appears that these meetings came about because Simmons, Downey, and Haaland had each mailed in cards (circulated in magazines such as that published by AARP) requesting information about the annuity products Payton was selling. Payton met with each of the women at their respective homes. Once they expressed an interest in the annuities, Payton asked how the purchases would be funded. All three had securities investments and were considering liquidating the securities in order to purchase the annuities. Payton

5

then contacted Knowles by telephone and, at Knowles' direction, collected financial and securities investment information from the women. Payton also obtained each woman's signature on the securities transaction forms which Knowles had provided to Payton. Payton thereafter turned the documents over to Knowles, who used the information and the signed forms to liquidate securities for Simmons and Downey. (Haaland transferred money directly to the annuity from a money market account.) Before executing the sales, however, Knowles contacted Simmons and Downey directly to obtain their consent for the sales and to recommend against liquidating certain of their investments.

¶9 Simmons subsequently filed a complaint with the Department concerning the liquidation of her securities by Knowles. Simmons stated that her daughter, a CPA, had reviewed the liquidations and determined that they were highly unsuitable for Simmons given her age, her cost basis, her liquidity, and her level of experience with investments. Knowles' supervisor at FSC likewise concluded that a fixed annuity product with a lengthy hold period was not appropriate for an elderly person such as Simmons. Downey and Haaland also contacted the Department with complaints and concerns about the transactions with Knowles and Payton.

¶10 Knowles' employment with FSC was terminated in May 2004. As a result, his registration as a securities salesperson also terminated. *See* § 30-10-201(10)(a), MCA. Knowles thereafter applied on August 24, 2004, for registration as a salesperson with Signal Securities, Inc. On August 30, however, the Department rejected his application and issued (1) the Notice of Proposed Agency Disciplinary Action and Opportunity for Hearing and (2) a Temporary Cease and Desist Order, and Order Denying Application.

The Department alleged that Knowles had violated certain provisions of the Securities Act in the transactions involving Simmons, Downey, and Haaland, including §§ 30-10-201(13)(g) and -301(1), MCA, which prohibit dishonest, unethical, and fraudulent practices. In addition, the Department alleged that FSC had violated § 30-10-201(13)(k), MCA, by failing to reasonably supervise Knowles. The Department proposed that the Commissioner impose fines for each violation and deny Knowles' application for registration as a securities salesperson.

¶11 On October 30, 2004, while these proceedings were pending, Knowles met with Kaye and Lynn Johnson. Knowles had managed the Johnsons' investment accounts while he was with FSC; and on this particular occasion, the Johnsons wanted to discuss their portfolio and give Knowles an IRA contribution. During the meeting, which took place in the Johnson's home, they discussed the Franklin AGE High Income Fund and Knowles suggested this fund would be one place to invest their money. The Johnsons inquired about why Eric Rolshoven (an FSC manager), instead of Knowles, was now appearing on their FSC account statements, and Knowles responded that Rolshoven had always been his supervisor. Knowles did not disclose that he was no longer employed at FSC, that he was not registered to conduct securities transactions, that he was under a cease-and-desist order, and that Rolshoven would have to handle their transactions. Knowles did indicate, though, that he was going to change companies. At the conclusion of the meeting, Mrs. Johnson gave Knowles her IRA contribution check of $3,500 made out to FSC. She assumed that he was going to invest the money for her "like he always has." A few days later, on November 3, Knowles forwarded the check to Rolshoven with

7

a letter in which he stated that the money was to be applied to Mrs. Johnson's account and that "[w]e discussed purchasing $7,000 of Franklin AGE high income B shares." Upon learning of these events, the Department amended its Notice to allege an additional violation of § 30-10-301(1), MCA (fraud or deceit), plus violations of § 30-10-201(1), MCA (transacting business as an unregistered salesperson) and § 30-10-201(13)(b), MCA (willfully violating or failing to comply with the Securities Act).

¶12 In early March 2005, FSC and the Commissioner entered into a settlement of the allegations against FSC. Pursuant to § 30-10-304(4), MCA, the Commissioner granted FSC immunity in exchange for its "continued cooperation in prosecuting Knowles." The Commissioner also dismissed with prejudice the allegations against FSC, and FSC agreed to make a donation to the Investor Protection Trust. The case proceeded to a four-day contested case hearing in March and April 2005, at which Simmons, Downey, Mrs. Johnson, Knowles, Payton, and Rolshoven testified. Various exhibits were admitted into evidence, as was Haaland's videotaped deposition (since she had passed away in February 2005). In addition, the Department and Knowles called two expert witnesses.

### The Hearing Examiner's Decision

¶13 The Hearing Examiner entered her Findings of Fact, Conclusions of Law, and Order on December 15, 2005. Regarding the allegations related to Haaland, the Hearing Examiner concluded that there were no Securities Act violations because Haaland had selected the funds used for the annuity purchase on her own and Knowles had not sold any securities on her behalf. With respect to the transactions involving Simmons and Downey, the Hearing Examiner found that Knowles had made recommendations to these

8

women regarding their securities and that he was under an obligation, therefore, to conduct a "suitability analysis" pursuant to § 30-10-201(13)(g), MCA, and Admin. R. M. 6.10.126 (now Admin. R. M. 6.10.401[1]). These provisions state that it is unethical for a salesperson to recommend to a customer the purchase, sale, or exchange of a security without grounds to believe that the transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other relevant information known by the salesperson. The Hearing Examiner decided that Knowles had met this requirement because he reviewed Simmons' and Downey's financial information (obtained through Payton) and spoke with them before actually completing the sales transactions on their behalf. The Hearing Examiner also concluded that Knowles had not engaged in any fraudulent practices under § 30-10-301(1), MCA. Notably, in reaching these conclusions, the Hearing Examiner observed that the Department was "correct" in questioning Knowles' actions in regard to Simmons and Downey, but the Hearing Examiner thought that the Securities Act lacked "clarity" and "guidance" regarding Knowles' arrangement with Payton and the definition of "suitability analysis." Thus, although the Securities Act is to "be construed to . . . protect the investor, persons engaged in securities transactions, and the public interest," § 30-10-102(1), MCA (paragraph break omitted), the Hearing Examiner gave Knowles "some benefit of the doubt" in relation to the transactions with Simmons and Downey.

---

[1] Effective September 26, 2008, Rule 6.10.126 was amended and transferred to 6.10.401. The amendments are not material to this case. Thus, for purposes of this Opinion, we henceforth shall use the new rule number—i.e., Admin. R. M. 6.10.401.

¶14 But with respect to the Johnsons, the Hearing Examiner determined that Knowles had violated § 30-10-301(1)(a), (b), and (c), MCA, by failing to tell the Johnsons that he was no longer employed by FSC and was not registered to conduct business as a securities salesperson. Furthermore, the Hearing Examiner concluded that Knowles had violated § 30-10-201, MCA, by attempting to effectuate a securities transaction on behalf of Mrs. Johnson when he was not registered to do so. The Hearing Examiner proposed fines of $5,000 per violation of §§ 30-10-301(1)(a), -301(1)(b), -301(1)(c), and -201, MCA, totaling $20,000. As support for this sanction, the Hearing Examiner observed that while Knowles was highly educated and had extensive experience in the securities business, he nevertheless acted in a fraudulent and deceitful manner in his dealings with the Johnsons. The Hearing Examiner further explained that

> [w]hile it is understandable he wished to maintain business ties with them, he was under an ethical and legal duty to be fully honest with them by telling them . . . that he was no longer employed with FSC, that he was under a cease and desist order, that he was no longer licensed as a securities salesperson, and further that the Johnsons should conduct their investment/securities business through Mr. Rolshoven. The Johnsons could have then made an informed decision about how to further proceed. [Knowles] failed to do this and instead led the Johnsons to believe and assume [Knowles'] position and authority to act on their behalf had not changed. [Knowles'] course of dealing was wrong and infringed upon the protections afforded to all investors in this State.

### The Commissioner's Decision

¶15 Knowles and the Department filed exceptions to the Hearing Examiner's decision and presented oral argument to the Commissioner. The Commissioner then reviewed the decision under the standards set forth in § 2-4-621(3), MCA, and issued the final agency decision on May 24, 2006. In his 46-page Corrected Findings of Fact, Conclusions of

10

Law, and Order and Notice of Opportunity for Judicial Review,[2] the Commissioner addressed Knowles' and the Department's exceptions and explained with particularity why he was modifying certain of the Hearing Examiner's findings of fact and conclusions of law.

¶16 The Commissioner agreed with the Hearing Examiner that Knowles did not violate the Securities Act with regard to Haaland. But as for Simmons and Downey, although the Commissioner accepted the Hearing Examiner's factual determinations he rejected her interpretation of Admin. R. M. 6.10.401. As noted, the Hearing Examiner construed this rule as requiring a suitability analysis before the salesperson completes the securities transaction. The Commissioner, however, noting that securities laws are to be construed to protect investors, persons engaged in securities transactions, and the public interest, *see* § 30-10-102(1), MCA, stated that a suitability analysis should be conducted once a prospective new client indicates a desire to make a securities transaction and before the client signs the documents to effectuate that transaction. The Commissioner reasoned that it is too late to conduct a suitability analysis after the transaction documents have been signed because at that point the decision has already been made and the documents to effectuate the securities transaction have already been completed. In the present case, for example, Payton obtained Simmons' and Downey's signatures on securities transaction documents before Knowles had even *received* their financial and securities investment information, let alone conducted the requisite suitability analysis.

---

[2] The Commissioner's original May 23, 2006 decision contained some clerical errors. He corrected those and issued his Corrected Findings of Fact, Conclusions of Law, and Order and Notice of Opportunity for Judicial Review on May 24.

The Commissioner concluded that this scheme constituted an "unethical practice" under § 30-10-201(13)(g), MCA. Furthermore, the Commissioner concluded that in failing to advise Simmons and Downey that he was required to complete a suitability analysis before having them sign the securities transaction documents, and in failing to actually perform the suitability analysis prior to their signing those documents, Knowles omitted material facts and engaged in a course of conduct and practice that operated as a fraud or deceit, in violation of § 30-10-301(1)(b) and (c), MCA.

¶17 Lastly, the Commissioner agreed with the Hearing Examiner's analysis regarding the Johnsons. He concluded that during the conversations with the Johnsons, Knowles omitted material facts regarding his employment and the type of business he was lawfully able to transact on their behalf. The Commissioner further concluded that in failing to tell the Johnsons that he was no longer employed by FSC, was no longer a registered salesperson, and could not effect or attempt to effect securities transactions on their behalf, Knowles employed a scheme or artifice to defraud, omitted to state material facts, and engaged in a course of conduct and practice that operated as a fraud or deceit, in violation of § 30-10-301(1)(a), (b), and (c), MCA. The Commissioner next determined that Knowles' November 3, 2004 letter to Rolshoven (in which he instructed Rolshoven to apply Mrs. Johnson's IRA check to her account and stated that he and the Johnsons had discussed purchasing $7,000 of Franklin fund shares) constituted an attempt by an unregistered salesperson to effect a securities transaction, in violation of § 30-10-201(1), MCA. Finally, the Commissioner concluded that Knowles' course of conduct with the Johnsons demonstrated a willful failure to comply with the Securities Act, in violation of

12

§ 30-10-201(13)(b), MCA. In this regard, the Commissioner noted that Knowles clearly was on notice of being unregistered when he received the call from the Johnsons, met with them, and forwarded the check with a letter to Rolshoven on their behalf. The Commissioner agreed with the Hearing Examiner that Knowles violated his ethical and legal duty to be fully honest with the Johnsons and that his course of dealing "was wrong and infringed upon the protections afforded to all investors in this State."

¶18 In imposing fines on Knowles for the foregoing violations of the Securities Act, the Commissioner first decided that while he was authorized by § 30-10-305(3), MCA, to impose a maximum fine of $5,000 for each violation, the total fine of $20,000 imposed by the Hearing Examiner was "sufficient" and he "did not wish to increase the total fine levied on Knowles while correcting the Hearing Examiner's proposed decision." The Commissioner accordingly apportioned the fines as follows:

- $2,500 for violating § 30-10-201(13)(g), MCA, and Admin. R. M. 6.10.401(2)(f) in his dealings with Simmons and Downey.
- $2,500 for violating § 30-10-301(1)(b), MCA, in his dealings with Simmons and Downey. (No fine is mentioned for the violation of § 30-10-301(1)(c), MCA.)
- $2,500 for violating § 30-10-301(1)(a), MCA, in his dealings with the Johnsons.
- $2,500 for violating § 30-10-301(1)(b), MCA, in his dealings with the Johnsons.
- $2,500 for violating § 30-10-301(1)(c), MCA, in his dealings with the Johnsons.
- $2,500 for violating § 30-10-201(1), MCA, by acting as a salesperson while not registered to do so.
- $5,000 for violating § 30-10-201(13)(b), MCA, by willfully failing to comply with the Securities Act.

The Commissioner stated that these sanctions were in the public interest and necessary for the protection of Montana investors. He noted that Knowles was highly educated and had over 18 years prior experience in the securities business serving hundreds of clients and acting as chair or officer to a number of professional organizations. Yet, despite all

13

this, Knowles acted in a fraudulent and deceitful manner and willfully failed to comply with the Securities Act in the aforementioned transactions.

## Subsequent Proceedings

¶19 Knowles filed his Petition for Judicial Review under §§ 2-4-702 and 30-10-308, MCA, on July 24, 2006, and the District Court entered its Order Reversing Corrected Findings of Fact, Conclusions of Law, and Order of State Auditor, Ex-Officio Commissioner of Securities on August 9, 2007. In its Order, the District Court first addressed two procedural claims raised by Knowles, ultimately ruling against him on those, and then addressed his challenges to the Commissioner's decision, ultimately concluding that he had not violated any provisions of the Securities Act. The District Court's reasoning will be discussed below where relevant. The Department now appeals.

## STANDARDS OF REVIEW

¶20 The scope of judicial review of a final agency decision is limited by statute. As a general rule, the review must be conducted by the court without a jury and must be confined to the record. Section 2-4-704(1), MCA. The court may reverse or modify the agency's decision if substantial rights of the appellant have been prejudiced because:

> (a) the administrative findings, inferences, conclusions, or decisions are: (i) in violation of constitutional or statutory provisions; (ii) in excess of the statutory authority of the agency; (iii) made upon unlawful procedure; (iv) affected by other error of law; (v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; (vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (b) findings of fact, upon issues essential to the decision, were not made although requested.

Section 2-4-704(2), MCA (paragraph breaks omitted); *see also* § 30-10-308, MCA.

14

¶21 In conducting its review, the court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Section 2-4-704(2), MCA. Likewise, because a hearing examiner (when one is used) is in the unique position of hearing and observing all testimony entered in the case, his or her determinations as to witness credibility are entitled to great deference. *Benjamin v. Anderson*, 2005 MT 123, ¶ 37, 327 Mont. 173, 112 P.3d 1039. In reviewing findings of fact, the question is not whether there is evidence to support *different* findings, but whether substantial evidence supports the findings actually made. *See Benjamin*, ¶ 55; *McDonald v. Dept. of Envtl. Quality*, 2009 MT 209, ¶ 48, 351 Mont. 243, 214 P.3d 749. Moreover, the court should give deference to an agency's evaluation of evidence insofar as the agency utilized its experience, technical competence, and specialized knowledge in making that evaluation. *See* § 2-4-612(7), MCA; *Johansen v. Dept. of Natural Resources and Conservation*, 1998 MT 51, ¶ 29, 288 Mont. 39, 955 P.2d 653.

¶22 In reviewing conclusions of law, the court must determine whether the agency's interpretation and application of law are correct. *McDonald*, ¶ 38; *Steer, Inc. v. Dept. of Revenue*, 245 Mont. 470, 474-75, 803 P.2d 601, 603 (1990). However, in determining whether the agency correctly interpreted its own rules, procedures, or policies, the agency's interpretation should be afforded great weight, and the court should defer to that interpretation unless it is plainly inconsistent with the spirit of the rule. The agency's interpretation of the rule will be sustained so long as it lies within the range of reasonable interpretation permitted by the wording. *See State Personnel Division v. Child Support Investigators*, 2002 MT 46, ¶ 63, 308 Mont. 365, 43 P.3d 305.

¶23 This Court employs these same standards when reviewing a district court's order affirming or reversing the agency's decision. *See McDonald*, ¶ 38; *Langager v. Crazy Creek Products, Inc.*, 1998 MT 44, ¶ 13, 287 Mont. 445, 954 P.2d 1169.

## DISCUSSION

¶24 The central issue in this appeal is whether the District Court erred in its decision on Knowles' petition for judicial review. This question implicates a number of sub-issues, which are identified and analyzed separately below.

### I. Knowles' Two Procedural Claims

¶25 Knowles contended in the District Court that the Commissioner's decision should be reversed because it was untimely under § 2-4-623(1)(a), MCA (2005), which states, in pertinent part: "A final decision must be issued within 90 days after a contested case is considered to be submitted for a final decision unless, for good cause shown, the period is extended for an additional time not to exceed 30 days." Knowles asserted that the present case was "submitted for a final decision" on August 10, 2005, when the parties submitted their post-hearing briefs to the Hearing Examiner; and he argued that since the decisions of the Hearing Examiner and the Commissioner were not issued within 90 (or even 120) days thereafter, those decisions were untimely and void.

¶26 Knowles raised this same argument before the Commissioner, who analyzed the legislative history of Senate Bill 260 (*see* Laws of Montana, 2005, ch. 571) and concluded that a contested case is not considered "submitted for a final decision" until the parties have filed their exceptions to the hearing examiner's decision and presented briefs and oral argument to the official who will render the final agency decision (in this case,

the Commissioner). Thus, the Commissioner ruled that his decision was timely because less than 90 days had elapsed since the parties submitted their supplemental briefs.

¶27 The District Court took a more direct approach to resolving this issue. The court observed that the 90-day provision on which Knowles was relying had been added to § 2-4-623(1)(a), MCA, in 2005. The court further observed that this new provision only applies to contested case hearings commenced after SB 260's passage, i.e., after May 2, 2005. *See* Laws of Montana, 2005, ch. 571, §§ 2, 3. Thus, since the contested case hearing in the present case actually concluded on April 29, 2005, the court held that the 90-day requirement was inapplicable. Knowles presents no challenge to this conclusion on appeal, and we accordingly affirm this section of the District Court's Order.

¶28 In his second procedural claim, Knowles argued that his due process rights were violated when the Department entered into the Settlement Agreement with FSC in March 2005 and filed a copy of that agreement with the Hearing Examiner but did not provide Knowles with notice of the agreement. Knowles asserted that he was thereby denied the opportunity to adequately cross-examine Rolshoven (Knowles' supervisor at FSC), particularly as to bias. Knowles also complained that the Department did not disclose, prior to the hearing, certain emails he allegedly wrote to Rolshoven regarding his relationship with Payton. Knowles contended that the Commissioner's decision, therefore, was "premised upon unlawful procedure" and should be reversed.

¶29 The District Court agreed that the Department should have given Knowles notice and a copy of the Settlement Agreement pursuant to Request for Production No. 10 in his discovery requests, which sought "any document which relates to the subject matter of

17

the Amended Notice." But the court determined that the Department's failure to do so did not rise to the level of a due process violation for several reasons: the materiality of the Settlement Agreement was not so great that it would probably produce a different result on retrial; the Settlement Agreement was not substantive evidence, but at most would have called Rolshoven's credibility into question; and the Hearing Examiner, who was solely responsible for determining the credibility of the witnesses, was aware of the Settlement Agreement. As for the emails, the court concluded that the Department should have provided those as well pursuant to Knowles' discovery request; however, the court again determined that the Department's failure to do so did not rise to the level of a due process violation.

¶30 On appeal, Knowles reiterates that he "received no notice whatsoever of the FSC Settlement Agreement and FSC's immunity, despite disclosure being properly within the scope of discovery requests submitted to the Department." Knowles complains that he consequently "was not able to call Rolshoven's immunity into issue during cross-examination." Yet, these bald assertions aside, Knowles presents no challenge, supported with authority and argument, to the District Court's conclusion that his due process rights were not violated. *See* M. R. App. P. 12(2). Accordingly, we affirm this section of the District Court's Order as well.

## II. The Simmons and Downey Transactions

¶31 As noted, the Commissioner concluded that in the transactions with Simmons and Downey, Knowles engaged in "unethical practices" in violation of § 30-10-201(13)(g), MCA, and omitted material facts and engaged in a course of conduct and practice that

18

operated as a fraud or deceit in violation of § 30-10-301(1)(b) and (c), MCA. We address these violations in turn.

## A. The 30-10-201(13)(g) Violation

¶32    The Commissioner spent a portion of his decision (separate from his Findings of Fact and Conclusions of Law) discussing Knowles' relationship with Payton in the context of the Simmons and Downey transactions. He identified three problematic facets of that relationship. First, the Commissioner opined that the extent of Payton's actions as an "emissary" of Knowles was improper and in violation of §§ 30-10-103(20) and -201, MCA (though, notably, he did not identify any such violation in his Conclusions of Law or impose a corresponding fine). The Commissioner reasoned that Payton's actions of gathering financial and securities investment information from prospective new clients and obtaining their signatures on the securities transaction forms provided by Knowles (confidential personal financial planning forms, change of investment objectives forms, account transfer forms, and durable power of attorney forms) were not merely "ministerial, administrative tasks," but rather were "the crux of a securities transaction." The Commissioner concluded that Knowles (as the registered salesperson) should have completed these forms with the prospective new clients himself and that by having Payton do so instead, Knowles facilitated Payton in attempting to effectuate securities transactions as an unregistered salesperson. The second problem identified by the Commissioner in the Knowles-Payton relationship is that Knowles is required to conduct a suitability analysis once a prospective new client indicates a desire to make a securities transaction, not after his "emissary" has already obtained the client's signature on the

documents to effectuate that transaction. The Commissioner ultimately concluded that Knowles violated this requirement with respect to Simmons and Downey. Third, and lastly, the Commissioner noted that it is unethical for a salesperson to execute a transaction on behalf of a customer without authorization to do so. *See* Admin. R. M. 6.10.401(1)(d), (2)(f). The Commissioner interpreted this rule as requiring a registered salesperson, not his unregistered "emissary," to obtain the authorization directly from the customer. Here, however, the Commissioner found no violation of this rule because Knowles contacted Simmons and Downey prior to transacting securities on their behalf.

¶33 Corresponding with the foregoing three points, the District Court in its Order identified and analyzed three "pertinent legal questions" relating to the transactions with Simmons and Downey: (1) whether Knowles facilitated Payton's attempts to effectuate securities transactions as an unregistered salesperson, (2) whether Knowles was required to conduct a suitability analysis, and (3) whether Knowles had authorization to execute the trades at issue. We note that this last question is in reality a nonissue. The Commissioner found that Knowles obtained authorization from Simmons and Downey to liquidate their securities; the District Court agreed; and the Department does not challenge that determination on appeal. Accordingly, we need not address Question (3).

¶34 As for Question (1), although the Commissioner suggested during his discussion of the Knowles-Payton relationship that Knowles violated the law by facilitating Payton's attempts to effectuate securities transactions as an unregistered salesperson, he did not identify a statute or rule addressing the "facilitation" of an unregistered salesperson in transacting securities. Moreover, the Commissioner did not identify any such violation in

20

his Conclusions of Law. Thus, his "facilitation" discussion is essentially dictum. *See* § 2-4-623, MCA. Nevertheless, the District Court purported at the end of its Question (1) analysis to reverse the Commissioner's Conclusion of Law No. 9 based on the court's perception that "Payton did not actually effect or attempt to effect the sales of securities." As a factual matter, this perception is belied by the record, which establishes that Payton did not merely "obtain and forward information" to Knowles (as the District Court saw it), but actually commenced the securities-transaction process with Simmons and Downey and obtained their signatures on the documents needed to liquidate their securities in order to purchase the annuities from Payton. But this point aside, Conclusion of Law No. 9 expressly identifies only one violation: Knowles' failure to conduct a timely suitability analysis. It does not state that Knowles violated a statute or rule by "facilitating" Payton's attempts to effectuate securities transactions as an unregistered salesperson. The District Court's analysis under Question (1), therefore, does not support a reversal of Conclusion of Law No. 9 (or, for that matter, any of the Commissioner's other conclusions of law). Accordingly, we must reverse the District Court's holding under the section of its Order captioned "1. Payton's role."

¶35    Lastly, with respect to Question (2), the District Court observed that the Securities Act prohibits "unethical practices" in the securities business, § 30-10-201(13)(g), MCA, and that "unethical practices" by a salesperson includes "recommending to a customer the purchase, sale, or exchange of a security without grounds to believe that the transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any

21

other relevant information known by the [salesperson]," Admin. R. M. 6.10.401(1)(c), (2)(f). The District Court concluded, however, that Knowles did not violate these provisions in the Simmons and Downey transactions. The court first reasoned that Simmons and Downey initiated the contact with Payton seeking information regarding annuities, Payton then provided them with information about annuities, the women chose to fund their annuities through the sale of securities, Payton had them fill out the paperwork, and the paperwork was then forwarded to Knowles. From this, the court concluded that neither Payton nor Knowles solicited the sale of a security from Simmons or Downey and, thus, no suitability analysis was required.

¶36   On appeal, the parties debate whether Knowles solicited securities transactions from Simmons and Downey. (Notably, the actual language of the rule is "recommend," not "solicit," and Knowles testified that he made recommendations to both women concerning the sale of their securities.) But that issue is really beside the point. The Commissioner is charged with making rules that are "necessary or appropriate in the public interest or for the protection of investors and consistent with the purposes of the policy and provisions of [the Securities Act]." Section 30-10-107(1), MCA. Admin. R. M. 6.10.401 was enacted pursuant to this statutory authority, and the Commissioner has interpreted subsections (1)(c) and (2)(f) of this rule as requiring a salesperson to conduct a suitability analysis once a prospective new client indicates a desire to make a securities transaction and before the client signs the securities transaction documents. As noted above, an agency's interpretation of its own rule should be afforded great weight, and the court should defer to that interpretation unless it is

22

plainly inconsistent with the spirit of the rule. The agency's interpretation of the rule will be sustained so long as it lies within the range of reasonable interpretation permitted by the wording. *See State Personnel Division*, ¶ 63. The critical issue, therefore, is whether the Commissioner's interpretation meets this standard. We conclude that it does.

¶37 It goes without saying that investors routinely rely on the specialized knowledge and experience of securities salespersons when making investment decisions. Such advice, when it is given, must of course be tailored to the needs and objectives of the particular individual. Admin. R. M. 6.10.401(1)(c) and (2)(f) seek to protect investors from ill-advised securities transactions and, to that end, place an ethical responsibility on salespersons to make a reasonable inquiry into a client's investment objectives, financial situation and needs, and any other relevant information before advising or counseling the client. Knowles argued that this ethical responsibility is met even after a prospective new client has signed the securities transaction forms by speaking with the client and making recommendations "prior to *completing* the securities transaction." The Commissioner, however, rejected this approach, as it puts the proverbial cart before the horse. Having a prospective new client sign documents to effectuate a securities transaction before analyzing whether a securities transaction would even be suitable for the client frustrates the purpose of the rule and the Securities Act which, as already noted, is to be construed to protect investors, persons engaged in securities transactions, and the public interest. Section 30-10-102(1), MCA. Executing securities transaction forms presupposes that a securities transaction is going to occur. Here, for example, having Simmons and Downey sign the securities transaction forms indicated that the decision to sell their securities in

order to buy Payton's annuities had already been made and the only issue was which securities. Yet, Admin. R. M. 6.10.401(1)(c) does not only require a suitability analysis as to *which* securities should be sold; it also requires a suitability analysis as to whether *any* securities should be sold. The Commissioner thus determined that to protect investors in situations where the salesperson does not have a preexisting relationship with the customer, it is critical that a suitability analysis be conducted once the customer indicates a desire to make a securities transaction, so as to ensure that the transaction is suitable. While Knowles claims that this is an "unreasonable extension" of the meaning of "unethical practices," we conclude that the Commissioner's interpretation is consistent with the spirit of Admin. R. M. 6.10.401(1)(c), as well as the Securities Act itself, and is within the range of reasonable interpretation permitted by the wording of that rule.[3]

¶38     The record reflects that once Simmons indicated she was considering liquidating securities in order to purchase an annuity from Payton, Payton contacted Knowles.

---

[3] It is important to note here that the Commissioner did not purport to articulate a rule applicable to all conceivable circumstances. Rather, he couched his interpretation of Admin. R. M. 6.10.401(1)(c) in terms of the specific factual scenario presented, in which Payton would go to a prospective new client's home to sell annuities and, once the person indicated a willingness to sell securities to fund the annuities purchase, would obtain her signature on securities transaction forms at Knowles' direction. Thus, Knowles' fear that the Commissioner's decision "essentially would forbid even office clerks from gathering client information for later review by a licensed salesperson" is grossly overstated. It seems that Knowles still fails to comprehend the essential reasons why his scheme with Payton was unethical. For one thing, Simmons and Downey were not *existing* clients; they were *prospective new* clients. Moreover, Payton was by no means an FSC "office clerk" merely "gathering client information"; he was a salesman who went to Simmons' and Downey's homes to sell annuities and, in the course of those meetings, obtained not just "client information," but also signatures on securities transaction documents (such as durable power of attorney forms). And all of this occurred before Knowles had even met the women, let alone conducted a suitability analysis. The Commissioner's interpretation is tied to these facts and does not stand for the sweeping rule Knowles suggests.

Simmons was a prospective new client about whom Knowles knew essentially nothing. Nevertheless, Knowles directed Payton to obtain her signature on securities transaction forms, which Knowles had provided to Payton and Payton had brought with him to the meeting, in order to effectuate a securities transaction on her behalf. The same thing happened with Downey. Completing the paperwork to effectuate a securities transaction *before* conducting the suitability analysis, however, creates the danger that the suitability analysis will be driven by the salesperson's desire to effect *some* transaction and provides an incentive to the salesperson to structure the suitability analysis to fit the transaction desired. This defeats the purpose of the suitability analysis, which is to determine *what, if any,* securities should be sold based on the unique circumstances of the client. The scheme employed by Knowles constituted an unethical practice by a securities salesperson under § 30-10-201(13)(g), MCA, and Admin. R. M. 6.10.401(1)(c) and (2)(f). We accordingly reverse the District Court's contrary conclusion.

## B. The 30-10-301(1)(b) and (c) Violations

¶39 The Commissioner concluded that in failing to advise Simmons and Downey that he was required to complete a suitability analysis before having them sign the securities transaction documents, and in failing to actually perform the suitability analysis once they indicated a desire to make a securities transaction, Knowles omitted material facts and engaged in a course of conduct and practice that operated as a fraud or deceit, in violation of § 30-10-301(1)(b) and (c), MCA. These provisions state that

> [i]t is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, in, into, or from this state, to . . . (b) make any untrue statement of a material fact or omit to state a

25

material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person. [Paragraph breaks omitted.]

¶40 The District Court disagreed with the Commissioner. The court first pointed to its earlier conclusion that Knowles was not required to perform a suitability analysis for Simmons and Downey. The court then reasoned that Knowles could not have violated § 30-10-301(1), MCA, by failing to advise Simmons and Downey of the requirement that he conduct a suitability analysis for them, when no such requirement existed.

¶41 Knowles likewise argues on appeal that he did not violate § 30-10-301(1), MCA, because he was not required to perform a suitability analysis for Simmons and Downey in the first place. Alternatively, he argues that because he ultimately completed suitability analyses for Simmons and Downey before making any recommendations and before the sales actually occurred, he could not have violated § 30-10-301(1), MCA. For the reasons discussed above, however, Knowles is incorrect on both counts. Suitability analyses were required, and the ones he conducted were untimely. Knowles presents no other basis for concluding that the Commissioner's analysis under § 30-10-301(1)(b) and (c), MCA, was in error. We accordingly reverse the District Court's conclusion that Knowles did not violate these provisions in his transactions with Simmons and Downey.

### III. The Johnsons Transaction

¶42 The Commissioner found that Knowles violated §§ 30-10-301(1)(a), (b), and (c), -201(1), and -201(13)(b), MCA, in his dealings with the Johnsons. As before, we address each of these violations in turn.

26

## A. The 30-10-301(1)(a), (b), and (c) Violations

¶43    The Commissioner concluded that in failing to tell the Johnsons he was no longer employed by FSC, was no longer a registered salesperson, and could not effectuate or attempt to effectuate securities transactions on their behalf, Knowles employed a scheme or artifice to defraud, omitted to state material facts, and engaged in a course of conduct and practice that operated as a fraud or deceit, in violation of § 30-10-301(1)(a), (b), and (c), MCA.  Again, these provisions state that

> [i]t is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, in, into, or from this state, to:  (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person.  [Paragraph breaks omitted.]

¶44    In addressing this issue, the District Court agreed with the Commissioner that by failing to tell the Johnsons that he was under a cease-and-desist order and could not engage in the sale of securities, Knowles omitted to state material facts that were necessary to make his other statements to the Johnsons not misleading.  But the court opined that such omissions could violate the statute only if they occurred in connection with an "actual" offer, sale, or purchase of a security by Knowles himself.  The court then reasoned that Knowles did not make any offer, sale, or purchase of a security for the Johnsons; rather, he discussed their portfolio with them and referred all matters to Rolshoven.  The court also noted that Knowles' November 3, 2004 letter to Rolshoven (with Mrs. Johnson's IRA check and instructions on what was to be done with the

27

money) was insufficient in itself to effect a securities transaction. Thus, the court concluded that "although Knowles was not forthright with the Johnsons, he did not engage in fraud, deceit, or misrepresentation in connection with an actual offer, sale, or purchase of a security."

¶45     We cannot condone the District Court's insertion of the term "actual" into the statute. *See* § 1-2-101, MCA ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted."). Section 30-10-301(1), MCA, simply states that it is unlawful for any person, "in connection with the offer, sale, or purchase of any security, directly or indirectly," to engage in the enumerated practices. Moreover, contrary to the District Court's interpretation, the statute is not limited to situations in which the person himself makes the offer, sale, or purchase. Rather, it broadly prohibits fraud, deceit, or misrepresentations that "any person" makes "in connection with" an offer, sale, or purchase of any security.

¶46     Here, the fraud, deceit, and misrepresentation found by the Commissioner were perpetrated by Knowles "directly" (as opposed to "indirectly" through an intermediary, *see e.g. People v. Blair*, 579 P.2d 1133, 1144-45 (Colo. 1978)), and the question is whether Knowles did so "in connection with" the offer, sale, or purchase of any security. The record fully supports the Commissioner's conclusion on this point. Knowles went to the Johnsons' home for the express purpose of discussing their portfolio and receiving an IRA contribution from Mrs. Johnson. During the meeting, they discussed the Franklin AGE High Income Fund, and Knowles suggested that this fund would be one place to

28

invest their money. At the conclusion of the meeting, Mrs. Johnson asked Knowles to take her IRA contribution check, believing that he was going to invest the money for her "like he always has." A few days later, Knowles forwarded the check to Rolshoven with a letter in which he stated that the money was to be applied to Mrs. Johnson's account and that "[w]e discussed purchasing $7,000 of Franklin AGE high income B shares." On these facts, Knowles' statements and other conduct were plainly "in connection with" the offer, sale, or purchase of a security. Section 30-10-301(1), MCA.

¶47 Turning, then, to the question of whether Knowles violated subsections (a), (b), and (c), Knowles attempts to refute the Commissioner's analysis by pointing to various excerpts of his testimony at the contested case hearing. For example, Knowles relies on his testimony that he told the Johnsons he was in between broker-dealers, he would send Rolshoven a note about the Franklin fund, Rolshoven would probably contact them, and Rolshoven would be servicing their account until Knowles was affiliated with a new broker-dealer. According to Knowles, his testimony establishes that he told the Johnsons that Rolshoven, not Knowles, would be handling Mrs. Johnson's request. Yet, Mrs. Johnson testified that Knowles did *not* inform them that Rolshoven would have to handle her transaction and did *not* tell them that they needed to talk to Rolshoven about their investments; he simply told them that Rolshoven had always been his supervisor. Mrs. Johnson also testified that Knowles did *not* indicate he was no longer employed by FSC and did *not* say he was in between companies; he simply said he was looking for another company because he wanted to do trusts. The Hearing Examiner, who was able to observe the witnesses, found Mrs. Johnson's testimony to be more credible than

29

Knowles' testimony with regard to these aspects of their meeting; and, as noted above, a hearing examiner's determinations as to witness credibility are entitled to great deference. *Benjamin v. Anderson*, 2005 MT 123, ¶ 37, 327 Mont. 173, 112 P.3d 1039.

¶48 But even assuming, for the sake of argument, that Knowles told the Johnsons he was in between broker-dealers and Rolshoven would be servicing their account, the Johnsons evidently did not comprehend the full import of this information, given that Mrs. Johnson gave him her IRA contribution check (which Knowles told her to make out to FSC) believing he was going to invest the money for her "like he always has." Knowles admits that he did not directly tell the Johnsons he was under a cease-and-desist order and was not registered to conduct securities business. Yet, § 30-10-301(1)(b), MCA, clearly prohibited him from omitting material facts that were necessary in order to make his statements to the Johnsons, in the light of the circumstances under which they were made, not misleading. Disclosing some, but not all, material facts is a plain violation of the statute; and Knowles does not deny that the facts he omitted were "material."

¶49 Knowles contends, however, that the Johnsons (as well as Simmons and Downey) suffered no financial loss as a result of his transactions with them. He made the same sort of "no harm, no foul" argument to the Commissioner, who rejected Knowles' attempt to insert a damages element into § 30-10-301(1), MCA. The Commissioner observed that the plain language of the statute does not require damage to be shown in order for there to be a finding of fraud. Indeed, the Commissioner pointed out that § 30-10-301(1)(c), MCA, makes it unlawful to "engage in any act, practice, or course of business that

30

operates *or would operate* as a fraud or deceit upon any person" (emphasis added), a clear indication that actual damage or injury is not an element of fraud under the statute. For these same reasons, we reject Knowles' "no harm, no foul" assertions on appeal.

¶50 In sum, Knowles has failed to show error in the Commissioner's conclusion that he employed a scheme or artifice to defraud, omitted to state material facts, and engaged in a course of conduct and practice that operated as a fraud or deceit in the transaction with the Johnsons. We accordingly reverse the District Court's conclusion that Knowles did not violate § 30-10-301(1)(a), (b), and (c), MCA.

## B. The 30-10-201(1) Violation

¶51 With exceptions not applicable here, it is unlawful for a person to transact business in this state as a salesperson unless the person is registered under the Securities Act. Section 30-10-201(1), MCA. A salesperson is "an individual other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect sales of securities." Section 30-10-103(20)(a), MCA. The Commissioner determined that Knowles' November 3, 2004 letter to Rolshoven (in which he instructed Rolshoven to apply Mrs. Johnson's IRA check to her account and stated that he and the Johnsons had discussed purchasing $7,000 of Franklin fund shares) constituted an attempt by an unregistered salesperson to effect a securities transaction. The District Court, however, concluded that because the letter (according to Rolshoven's testimony) was not "authorization" for Rolshoven to purchase anything, it did not constitute an attempt to effect a securities transaction.

31

¶52 We disagree with the District Court's narrow construction of the word "attempt." It was not necessary that Knowles' letter be sufficient in itself to effect a securities transaction, nor was it necessary that the letter actually accomplish that result. "Attempt" is defined as "[t]he act or an instance of making an effort to accomplish something, esp. without success." *Black's Law Dictionary* 123 (Bryan A. Garner ed., 7th ed., West 1999). Here, Knowles met with the Johnsons to discuss their portfolio and to receive an IRA contribution from Mrs. Johnson. He then sent Mrs. Johnson's $3,500 check and a letter to Rolshoven. The letter contained "instructions" (as the District Court put it) regarding Mrs. Johnson's account and her IRA contribution check—specifically, that the $3,500 was to be applied to her account and that they had discussed purchasing $7,000 of Franklin fund shares. While Knowles claims that he was "merely passing along information to Rolshoven," the circumstances of his meeting with the Johnsons and the language of his letter establish that he did more than simply transmit information. Moreover, while he suggests otherwise, his actions were not gratuitous; rather, they were designed to maintain his business ties with the Johnsons. Knowles attempted to effect a securities transaction on Mrs. Johnson's behalf; and, in so doing, he transacted business as a securities salesperson without being registered under the Securities Act, in violation of § 30-10-201(1), MCA. We reverse the District Court's contrary conclusion.

## C. The 30-10-201(13)(b) Violation

¶53 Section 30-10-201(13)(b), MCA, prohibits willful violation of, or willful failure to comply with, any provision of the Securities Act or any rule or order under the Act. The Commissioner found that Knowles violated this provision in his dealings with the

32

Johnsons. Specifically, the Commissioner determined that Knowles' course of conduct with the Johnsons demonstrated a willful failure to comply with the Securities Act given that he was on notice of being unregistered when he received their call, when he met with them, and when he forwarded Mrs. Johnson's check to Rolshoven with instructions on what was to be done with the money. The Commissioner stated that

> [w]hile it is understandable [Knowles] wished to maintain business ties with [the Johnsons], he was under an ethical and legal duty to be fully honest with them by telling them (even at the time Mr. Johnson called him to set up a meeting) that he was no longer employed with FSC, that he was no longer licensed as a securities salesperson, and further that the Johnsons should conduct their investment/securities business through Mr. Rolshoven. The Johnsons could have then made an informed decision about how to proceed. Knowles failed to do this and instead led the Johnsons to believe and assume Knowles' position and authority to act on their behalf had not changed. Knowles' course of dealing was wrong and infringed upon the protections afforded to all investors in this State. [Footnotes omitted.]

¶54 The District Court concluded that Knowles did not violate § 30-10-201(13)(b), MCA, because he did not violate any provision of the Securities Act in his dealings with the Johnsons. On appeal, Knowles argues that the District Court's reasoning is correct, but this clearly is not the case. As discussed above, Knowles violated the Securities Act (in particular, §§ 30-10-301(1) and -201(1), MCA) in his transaction with the Johnsons.

¶55 Knowles also argues that the Temporary Cease and Desist Order issued on August 30, 2004, expired before his meeting with the Johnsons on October 30, 2004, and was "actually void" at this point in time. But this argument is without merit as well, for two reasons. First, Knowles' position is based on Admin. R. M. 6.2.122, which states that a hearing, if requested, on a temporary cease-and-desist order must be held within 30 days of the Commissioner's receipt of the hearing request unless the time is extended by

agreement of the parties or by order of the hearing examiner. In Knowles' view, a temporary cease-and-desist order becomes a "legal nullity" if (as occurred here) the 30-day period passes without a hearing or an extension. Yet, even if this interpretation of Admin. R. M. 6.2.122 is correct, it is axiomatic that an administrative rule is invalid to the extent it is in conflict with an applicable statute, *see* § 2-4-305(6)(a), MCA; and § 30-10-305(1)(a)(i), MCA, states that a temporary cease-and-desist order "remains in effect until 10 days after the hearing examiner issues proposed findings of fact and conclusions of law and a proposed order," an event which had not occurred by October 30, 2004. Second, even if there had been no temporary cease-and-desist order in place, Knowles was still subject to the Securities Act, which states that it is unlawful for a person to transact business in this state as a salesperson unless the person is registered. Section 30-10-201(1), MCA.

¶56 The record fully supports the Commissioner's determination that Knowles' course of conduct with the Johnsons demonstrated a willful failure to comply with the Securities Act. We accordingly reverse the District Court's conclusion that Knowles did not violate § 30-10-201(13)(b), MCA.

## CONCLUSION

¶57 The District Court ruled against Knowles on the two procedural claims raised in his petition for judicial review. We affirm the District Court as to both of those claims. The District Court ruled in favor of Knowles on all of his challenges to the Securities Act violations found by the Commissioner. We reverse the District Court as to all of those violations. The Commissioner's conclusions that Knowles violated §§ 30-10-201(13)(g)

34

and -301(1)(b) and (c), MCA, in the transactions involving Simmons and Downey and §§ 30-10-301(1)(a), (b), and (c), -201(1), and -201(13)(b), MCA, in his dealings with the Johnsons are supported by the record, both factually and legally. For these reasons, Knowles' petition for judicial review should have been denied in its entirety.

¶58    Affirmed in part and reversed in part.

/S/ JAMES C. NELSON

We concur:

/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS

Justice Jim Rice, concurring.

¶59    I concur with the results reached by the Court and appreciate the important distinction the Court makes within footnote 3. Opinion, ¶ 37 n. 3.

¶60    The Commissioner is authorized by statute to make necessary and appropriate rules for the protection of investors under the Securities Act. Opinion, ¶ 36 (citing § 30-10-107(1), MCA). In this case, the Commissioner interpreted Admin. R. M. 6.10.401(1)(c) and (2)(f) as requiring a salesperson to conduct a suitability analysis once a prospective new client indicates a desire to make a securities transaction and before the client signs any securities transaction documents. The Commissioner concluded that, "[a]s a registered salesperson, Knowles should have completed the Confidential Personal Financial Planning form with the prospective new clients and should have completed a

35

suitability analysis prior to the new client signing the account transfer form, Change of Investment objectives form, and Durable Power of Attorney."

¶61    As the Court correctly notes, the Commissioner based this rule on the unique facts and circumstances of this case.  Opinion, ¶ 37 n. 3.  Payton, an insurance salesman, visited the homes of Simmons and Downey, and obtained sensitive financial documents and signatures from the prospective customers.  Payton obtained this information to assist Knowles in liquidating Simmons's and Downey's securities, so that Payton could finance his annuity sale, all pursuant to a scheme with Knowles.  All of this occurred before Knowles, the actual licensed securities salesman, had any contact with the customers.  Under these facts, the Commissioner properly concluded that Knowles had violated the governing statutes and regulations.

¶62    However, the outcome could well be different if this case had involved the more common business practices conducted every day by reputable securities firms and their brokers and staffs.  After inquiry by a customer, various contacts by and between brokers, assistants and staffs and the customer ensue to obtain necessary information and prepare appropriate documentation for the securities transactions the customer desires.  A broad application of the rules applied in this case could very well impose a rigid process on securities sales which would disrupt everyday practices of reputable securities firms and the objectives of their customers.  Nothing in our opinion should serve to impose a single, rigid procedure for application in all securities sales.

/S/ JIM RICE

36