FILED

April 13 2010

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 09-0023

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 78

GREGG MOSLEY, JOY FARRELL MOSLEY,
FRED FELLOWS, DEBORAH FELLOWS,
GARY BAUER, and JANA BAUER,

      Plaintiffs, Appellants, and Cross-Appellees

    v.

AMERICAN EXPRESS FINANCIAL ADVISORS, INC.,
BRITT B. DAVIS, GARY WEXLER, WEX WHEELS, INC.,
and KEEP IT SIMPLE STUPID, LLC,

      Defendants and Appellees,

    and

AMERICAN EXPRESS FINANCIAL ADVISORS, INC.,

      Cross-Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                In and For the County of Gallatin, Cause No. DV-2002-151
                Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Larry Jent, Williams & Jent, LLP, Bozeman, Montana

                Christopher Harris, Attorney at Law, Bozeman, Montana

        For Appellee:

                J. Devlan Geddes, Trent M. Gardner, Goetz, Gallik & Baldwin, P.C.,
                Bozeman, Montana

Submitted on Briefs: January 13, 2010

Decided: April 13, 2010

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 This case concerns a multi-million dollar financial scheme involving Britt Davis, who was employed with American Express Financial Advisors, Inc., now known as Ameriprise Financial, Inc. (hereinafter, Ameriprise). A jury in the Eighteenth Judicial District Court, Gallatin County, found that Davis had offered or sold unregistered securities to Gregg and Joy Farrell Mosley (the Mosleys) and Fred and Deborah Fellows (the Fellows). The jury awarded $70,000 to the Mosleys. (The Fellows had previously settled with Davis.) However, following the jury's verdict, the District Court dismissed the Mosleys' claim against Davis based on his statute-of-limitations defense. As for the Mosleys' and the Fellows' claims against Ameriprise, the jury found that Ameriprise was not a "control person" of Davis with respect to any of the Mosleys' and the Fellows' purchases of unregistered securities. The Mosleys and the Fellows now appeal, and Ameriprise cross-appeals. We affirm.

## ISSUES

¶2 The Mosleys and the Fellows articulate seven appeal issues, while Ameriprise articulates four cross-appeal issues. We conclude, however, that the following two issues, restated here, are dispositive of this appeal:

1. Did the District Court err in dismissing the Mosleys' claim against Davis based on his statute-of-limitations defense?

2. Was Ameriprise liable as a "control person" of Davis with respect to the Mosleys' and the Fellows' purchases of unregistered securities?

## BACKGROUND

3

¶3      This story begins with the advent of what the Mosleys and the Fellows term a "Ponzi scheme"[1] known as Wex Wheels, Inc. Under this scheme, Gary Wexler, who owned car dealerships in San Diego, California, and Las Vegas, Nevada, sold automobiles by way of installment sales contracts, which he then sold as assignments to third parties. In November 1998, Davis, who at the time worked for Ameriprise as a financial advisor, persuaded the Fellows to make an initial investment of roughly $33,000 in Wexler's automobile-financing scheme, indicating that the investments would yield rates of return in excess of 12 percent. The Fellows' first investment went well and they received the promised return. In January 2000, Davis retired from Ameriprise. In May 2000, the Fellows sold their home in Montana for around $900,000 and invested all but $80,000 of the proceeds in Wex Wheels assignments.

¶4      The Mosleys also invested in Wex Wheels. Gregg Mosley, a boyhood friend of Davis, invested $70,000 in Wex Wheels during a Thanksgiving visit with Davis in 1999. While this was the only investment the Mosleys made in Wex Wheels before Davis retired from Ameriprise, they continued to invest after Davis's retirement.

_____

[1] A Ponzi scheme is a fraudulent investment arrangement in which returns to investors are paid not from any "profits" of an underlying business venture, but from monies obtained from later investors. The fraud consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment. As a result of the absence of sufficient (or any) assets able to generate funds necessary to pay the promised returns, the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse. *See In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993); *In re United Energy Corp.*, 944 F.2d 589, 590 n. 1 (9th Cir. 1991); *Cunningham v. Brown*, 265 U.S. 1, 7-8, 44 S. Ct. 424, 425 (1924).

¶5    As it turned out, Wexler was selling assignments to third parties, including the Fellows and the Mosleys, which were backed by fictitious automobile loans. The scheme collapsed and the Fellows, the Mosleys, and other investors lost millions of dollars. When Davis discovered Wexler's unlawful actions, he turned Wexler in to the FBI. Wexler ultimately pleaded guilty in United States District Court in Nevada to wire fraud (for faxing 41 fraudulent vehicle loan contracts to Davis in Montana).

¶6    On March 14, 2002, the Mosleys and the Fellows commenced the present action in District Court. Their Third Amended Complaint, filed March 7, 2003, alleged seven counts; however, as trial approached, the Mosleys and the Fellows began dismissing some of their claims. Ultimately, they maintained claims against Davis and Wexler for the sale of unregistered securities (in the form of Wex Wheels assignments) and claims against Ameriprise based on the theory that the company had "control person" liability for Davis's sale of unregistered securities.

¶7    In May 2006, the District Court entered a default judgment against Wexler in the amount of $3,162,103.00. In November 2008, the case against Davis and Ameriprise proceeded to a seven-day jury trial. Ultimately, the jury found that Davis's sales of Wex Wheels assignments to the Mosleys and the Fellows constituted the sale of unregistered securities, but that Ameriprise was not a "control person" of Davis for any of those sales. As noted, the District Court dismissed the Mosleys' claim against Davis post-verdict, based on his statute-of-limitations defense.[2] Accordingly, the District Court entered

_____

[2] Davis first raised this defense in his answer to the complaint, but the District Court did not issue a final ruling on the defense until after trial.

5

judgment as follows: the Mosleys take nothing against Davis, and the Mosleys and the Fellows take nothing against Ameriprise.

¶8 Additional facts are set forth below where relevant.

## DISCUSSION

¶9 *Issue 1. Did the District Court err in dismissing the Mosleys' claim against Davis based on his statute-of-limitations defense?*

¶10 We review de novo a district court's interpretation and application of a statute. *In re J.D.N.*, 2008 MT 420, ¶ 8, 347 Mont. 368, 199 P.3d 189.

¶11 In their Third Amended Complaint, the Mosleys alleged that Davis had sold them an unregistered security in violation of § 30-10-202, MCA, and that Davis had sold them a security by means of fraud or misrepresentation. These claims were premised on § 30-10-307(1), MCA, which states:

> Any person who offers or sells a security in violation of 30-10-202 or offers or sells a security by means of fraud or misrepresentation is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at 10% per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less:
> (a) the value of the security when the buyer disposed of it; and
> (b) interest at 10% per annum from the date of disposition.

¶12 The applicable statute of limitations for these claims is set forth in § 30-10-307(5), MCA, which states as follows:

> (a) No action may be maintained under this section to enforce any liability founded on a violation of 30-10-202 unless it is brought within 2 years after the violation occurs.

6

(b) No action may be maintained under this section to enforce any liability founded on fraud or misrepresentation unless it is brought within 2 years after discovery of the fraud or misrepresentation on which the liability is founded or after such discovery should have been made by the exercise of reasonable diligence.

(c) In no event may an action be maintained under this section to enforce any liability founded on fraud or misrepresentation unless it is brought within 5 years after the transaction on which the action is based.

¶13 The Mosleys dismissed their fraud/misrepresentation claim before trial, which left their claim that Davis had sold them an unregistered security in violation of § 30-10-202, MCA, which states:

It is unlawful for any person to offer or sell any security in this state, except securities exempt under 30-10-104 or when sold in transactions exempt under 30-10-105, unless:

(1) the security is registered by notification, coordination, or qualification under parts 1 through 3 of this chapter; or

(2) for a federal covered security, the security has been filed with the commissioner pursuant to 30-10-211 and the fee prescribed in 30-10-209 has been paid.

¶14 The District Court dismissed this "30-10-202 claim" based on § 30-10-307(5)(a), MCA (quoted above). The jury had found that the Mosleys purchased a number of unregistered securities in 1999, 2000, and 2001; however, the jury had also found that of these purchases, the only one in which Davis was an "offeror" or "seller" occurred on November 27, 1999.[3] Thus, because the Mosleys filed their initial complaint on

---

[3] The Mosleys assert that the jury was wrong on this point. They claim that "[n]o evidence whatsoever exists" that Wexler offered or sold them Wex Wheels assignments. Thus, because "[t]he only other person that could have was Davis," the Mosleys reason that the jury's verdict (finding that Davis sold to them only once, in November 1999) is contrary to the evidence. As Ameriprise points out, however, there is evidence in the record that the Mosleys' subsequent purchases in 2000 and 2001 did not involve Davis, but rather were from Wexler. The jury resolved this factual matter against the Mosleys,

March 14, 2002, nearly two years and four months after Davis's violation of § 30-10-202, MCA, the District Court concluded that their 30-10-202 claim was untimely and dismissed it with prejudice.

¶15 The Mosleys contend that the District Court erred because their 30-10-202 claim did not accrue until August 2001. They rely on § 27-2-102(1), MCA, which states:

> For the purposes of statutes relating to the time within which an action must be commenced:
> (a) a claim or cause of action accrues when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other agency is authorized to accept jurisdiction of the action;
> (b) an action is commenced when the complaint is filed.

The Mosleys also rely on *Uhler v. Doak*, 268 Mont. 191, 885 P.2d 1297 (1994), where we held that a claim of professional negligence by an attorney did not accrue, and the statute of limitations did not begin to run, until the client sustained damages. Based on these authorities, the Mosleys argue that there can be no cause of action for a violation of § 30-10-202, MCA, and thus the statute of limitations does not begin to run, until damages have occurred. Here, they maintain, there were no damages until Wex Wheels collapsed in August 2001, making the filing of their complaint on March 14, 2002, well within the statute of limitations.

¶16 We disagree with this approach for two reasons. First, as Ameriprise points out, § 30-10-307(5)(a), MCA, specifically requires a claim founded on a violation of § 30-10-202, MCA, to be brought "within 2 years *after the violation occurs*" (emphasis

---

based on the evidence, and the Mosleys have presented no factual or legal basis for disturbing the jury's verdict in this regard.

8

added).  The violation occurs when a person offers or sells an unregistered security—not, as the Mosleys argue, when the unregistered security loses its presumed value or stops paying the expected returns.  *See* § 30-10-202, MCA.  Second, and along these same lines, § 27-2-102(1)(a), MCA, states that a claim or cause of action accrues "when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other agency is authorized to accept jurisdiction of the action."  As just noted, a claim under § 30-10-307(1), MCA, that a person offered or sold a security in violation of § 30-10-202, MCA, is complete when the offer or sale occurs—again not, as the Mosleys claim, years later when the purchaser decides that she made a bad investment.

¶17    The Mosleys argue, however, that where there has been a "concealment of injury," the limitations period does not begin until the injury is discovered.  Here, they contend, Wexler concealed the fact that the assignments were based on fictitious auto-loan contracts and the Mosleys did not discover this concealment until July 2001.  As support for this theory, the Mosleys rely on § 27-2-102(3), MCA, which states:

> The period of limitation does not begin on any claim or cause of action for an injury to person or property until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if:
> (a) the facts constituting the claim are by their nature concealed or self-concealing; or
> (b) before, during, or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause.

¶18    There are two problems with the Mosleys' reliance on this provision.  First, while the Mosleys assert that "[t]he trial evidence revealed that neither Davis nor the Mosleys

9

knew that Gary Wexler was providing phony contracts to investors until July of 2001," they have failed to explain why the facts constituting their 30-10-202 claim could not have been discovered "in the exercise of due diligence." Section 27-2-102(3), MCA.

¶19 Second, and more fundamentally, the statutory scheme set out in § 30-10-307(5), MCA, precludes application of § 27-2-102(3), MCA, to 30-10-202 claims. As Ameriprise points out, an action founded on a 30-10-202 violation must be brought "within 2 years *after the violation occurs*." Section 30-10-307(5)(a), MCA (emphasis added). Yet, in contrast, an action founded on fraud or misrepresentation must be brought "within 2 years *after discovery of the fraud or misrepresentation on which the liability is founded or after such discovery should have been made by the exercise of reasonable diligence*," though not later than "5 years after the transaction on which the action is based." Section 30-10-307(5)(b), (c) (emphasis added). In light of this differing treatment of 30-10-202 claims and fraud/misrepresentation claims, Ameriprise argues that the Legislature specifically intended that the limitations period for 30-10-202 claims *not* be based on the date of discovery of the 30-10-202 violation. We agree.

¶20 When a general statute and a specific statute are inconsistent, the specific statute governs, so that a specific legislative directive will control over an inconsistent general provision. *Mercury Marine v. Monty's Enters., Inc.*, 270 Mont. 413, 417, 892 P.2d 568, 571 (1995). Here, we conclude that the specific statute (§ 30-10-307(5)(a), MCA) controls over the general statute (§ 27-2-102(3), MCA). The Legislature addressed the statutes of limitation for 30-10-202 claims and fraud/misrepresentation claims within the same statutory provision—namely, § 30-10-307(5), MCA. The Legislature included a

"discovery" clause for fraud/misrepresentation claims in subsection (5)(b) but did not include a "discovery" clause for 30-10-202 claims in subsection (5)(a). The implication of this is clear: The Legislature did not intend for the limitations period on 30-10-202 claims to run from the date of discovery of the 30-10-202 violation. Under these circumstances, we will not apply § 27-2-102(3), MCA, to 30-10-202 claims. Nor may we insert a "discovery" clause into § 30-10-307(5)(a), MCA, for 30-10-202 claims.[4] *See* § 1-2-101, MCA ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.").

¶21 The Mosleys' 30-10-202 claim was not brought within two years after Davis offered or sold them an unregistered security. Accordingly, the District Court did not err in dismissing their claim against Davis based on his statute-of-limitations defense. Section 30-10-307(5)(a), MCA.

---

[4] This interpretation of the statutory scheme could potentially lead to harsh or inequitable results where, for example, the purchaser had no reasonable basis for knowing or discovering that the security was unregistered. Indeed, § 30-10-307(5)(a), MCA, as presently written, may allow unscrupulous brokers to escape liability for violating § 30-10-202, MCA, if the consumer fails to discover the illegal nature of the transaction until several years later. However, it is up to the Legislature, not this Court, to address this issue. In this regard, the statute defining the underlying causes of action and the available remedies (§ 30-10-307, MCA) is exceedingly convoluted and may warrant reexamination by the Legislature and the Commissioner of Securities. For instance, it is not clear whether a fraud/misrepresentation claim is in addition to, or mutually exclusive of, a 30-10-202 claim, and it is likewise unclear whether the remedy for both claims is exactly the same. Given that the Securities Act of Montana "is intended to protect the investor, persons engaged in securities transactions, and the public interest," *Knowles v. State ex rel. Lindeen*, 2009 MT 415, ¶ 1, 353 Mont. 507, 222 P.3d 595 (citing § 30-10-102(1), MCA), clarifying this provision (and others in the Securities Act, *see e.g. Knowles*, ¶ 37 n. 3) would be beneficial to sellers and investors alike.

¶22   *Issue 2. Was Ameriprise liable as a "control person" of Davis with respect to the Mosleys' and the Fellows' purchases of unregistered securities?*

¶23   The Mosleys' and the Fellows' claims against Ameriprise were premised on "control person" liability.  A "control person" shares the liability for violations of securities laws with the primary violator it controlled.  *See* § 30-10-307(2), MCA.  This statute states:

> Every person who directly or indirectly controls a seller liable under subsection (1), every partner, officer, or director (or person occupying a similar status or performing similar functions) or employee of such a seller, and every broker-dealer or salesperson who participates or materially aids in the sale is liable jointly and severally with and to the same extent as the seller if the nonseller knew, or in the exercise of reasonable care could have known, of the existence of the facts by reason of which the liability is alleged to exist. . . .

Section 30-10-307(2), MCA.  Thus, to prevail on this claim, the Mosleys and the Fellows had to show both (1) that Ameriprise directly or indirectly controlled Davis and (2) that Ameriprise knew, or in the exercise of reasonable care could have known, of the existence of the facts upon which Davis's liability is premised.  Generally, status as a control person is a question of fact.  *See Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 485-86 (6th Cir. 1992); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992).[5]  Here, the jury ultimately found that Ameriprise was

---

[5] First enacted in 1961, the Securities Act of Montana is a substantial adoption of the major provisions of the Uniform Securities Act promulgated by the Conference of Commissioners on Uniform State Laws, though it contains some variations, omissions, and additional matter.  *See* Chapter Compiler's Comments, Title 30, chapter 10, MCA (Annotations 2008).  Because our Securities Act is a Uniform State Law and is traceable to federal law, federal cases and cases from other states adopting the Uniform Securities Act are helpful in the interpretation of our Securities Act.  *State v. Duncan*, 181 Mont. 382, 390, 393, 593 P.2d 1026, 1031, 1033 (1979).

not a "control person" for any of Davis's sales of Wex Wheels assignments to the Mosleys and the Fellows.

¶24 The Mosleys and the Fellows contend, however, that the jury was not adequately instructed on the meaning of "control person." For that matter, they argue that whether an entity is a "control person" is a matter of law and that the status of Ameriprise as the broker-dealer for Davis was sufficient to establish it as the "control person" for him. As support for this argument, they cite *Martin v. Shearson Lehman Hutton, Inc.*, 986 F.2d 242 (8th Cir. 1993). In *Martin*, the court held that Shearson Lehman Hutton's status as employer of the investment broker, who had unlawfully solicited the purchase of a security by the plaintiff, was sufficient to establish it as a controlling person. *Id.* at 244. In so doing, the court cited *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1573-78 (9th Cir. 1990) (en banc), for the proposition "that a brokerage house is, as a matter of law, a controlling person for purposes of the securities laws, but that the brokerage house is not liable if it can prove good faith and a lack of inducement." *Martin*, 986 F.2d at 244. In response, Ameriprise argues that it was entitled to judgment as a matter of law on the Mosleys' and the Fellows' control-person liability claims.[6] Citing *Hauser v. Farrell*, 14 F.3d 1338 (9th Cir. 1994), Ameriprise contends that the Wex Wheels assignments were outside of its knowledge and control and that no reasonable juror could have reached a different conclusion. For the reasons which follow, we reject the per se rule suggested by

---

[6] On the fifth day of trial, Ameriprise moved under M. R. Civ. P. 50(a) for judgment as a matter of law on the ground that it could not be held liable as a "control person" of Davis with respect to the Wex Wheels assignments. The District Court denied the motion on the ground that there were factual questions related to this issue which needed to be resolved by the jury.

the Mosleys and conclude that on the record here, Ameriprise was not liable as a "control person" of Davis regarding sales of Wex Wheels assignments.

¶25   In *Hauser*,[7] the Ninth Circuit analyzed control-person liability for purposes of the Securities Exchange Act of 1934.  Under 15 U.S.C. § 78t(a),

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

The Court of Appeals noted that under its holding in *Hollinger*, *supra*, a broker-dealer is, as a matter of law, "a controlling person under that provision with respect to its registered representatives," since "the securities laws impose on broker-dealers a duty to supervise their registered representatives, and the representatives need the dealers to gain access to the securities markets."  *Hauser*, 14 F.3d at 1341 (citing *Hollinger*, 914 F.2d at 1573).  However, the court also noted that "a broker-dealer is not necessarily liable 'for all actions taken by its registered representatives,' and is not an insurer of its representatives."  *Id.* (quoting *Hollinger*, 914 F.2d at 1575).  In this connection, the court observed that some actions by a stockbroker may be outside the firm's control:

> "The broker-dealer may also, of course, rely on a contention that the representative was acting outside of the broker-dealer's statutory 'control.' For example, [the broker-dealer] could argue that when appellants entrusted their money to [the representative] they were not reasonably relying upon him as a registered representative of [the broker-dealer], but were placing the money with [the representative] for purposes other than investment in

---

[7] *Hauser* has since been impliedly overruled, on grounds not relevant to the present discussion, by *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S. Ct. 1439 (1994).  *See S.E.C. v. Fehn*, 97 F.3d 1276 (9th Cir. 1996).

markets to which [the representative] had access only by reason of his relationship with [the] broker-dealer."

*Id.* (brackets in *Hauser*) (quoting *Hollinger*, 914 F.2d at 1575-76 n. 26). Ultimately, the court affirmed the district court's grant of summary judgment against the plaintiffs (Hauser and Acosta) on their control-person claim:

> Considering all the circumstances of the transactions, Mr. Hauser and Mr. Acosta were not reasonably relying upon the stockbrokers as registered representatives of [the securities brokerage firm] Rauscher, Pierce. They were placing the money with the stockbrokers for purposes other than investment in markets to which stockbrokers had access only by reason of their relationship with Rauscher, Pierce. As the district court pointed out, the brokers did not need Rauscher, Pierce to promote [New Technologies in Energy (NTE)], it was not the kind of investment for which a customer typically relies on a broker with access through his firm to a stock exchange, and Hauser bought into NTE before the brokers even went to work for Rauscher, Pierce. Acosta knew that the brokers were planning to quit working for Rauscher, Pierce so that they could devote more of their efforts to NTE [which was not a Rauscher, Pierce promotion and which the two stockbrokers owned themselves]. Rauscher, Pierce had no knowledge of or financial interest in the NTE venture. In addition to the evidence expressly alluded to by the district judge, we note that Mr. Hauser's and Mr. Acosta's statements from Rauscher, Pierce did not list the NTE investments. Mr. Hauser and Mr. Acosta did not, in the deposition excerpts provided to the district court, contradict the brokers' representations that they told the customers that the NTE investment would not be through Rauscher, Pierce and had nothing to do with Rauscher, Pierce.

*Id.* at 1342-43.

¶26 Although the language of 15 U.S.C. § 78t(a) is not identical to § 30-10-307(2), MCA, the two provisions involve a similar approach: liability is imposed for directly or indirectly controlling the primary violator, but the controlling person avoids liability under § 30-10-307(2), MCA, if he did not know, or in the exercise of reasonable care could not have known, of the facts upon which the violator's liability is premised, and the

15

controlling person avoids liability under § 78t(a) if he acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. With respect to the first element (whether the person directly or indirectly controlled the primary violator), we conclude that the approach of the court in *Hauser* is appropriate for analysis under § 30-10-307(2), MCA. In other words, as a general rule a broker-dealer controls its registered representatives, whether directly or indirectly. But at the same time, certain actions by a stockbroker may be outside the firm's control. *Hauser* presented one such scenario, and we agree with Ameriprise that this case presents another such scenario.

¶27 Here, Ameriprise argues, and the record confirms, that Davis did not act in his role as a representative of Ameriprise when he sold the Wex Wheels assignments to the Mosleys and the Fellows. Wex Wheels had no relationship with Ameriprise and was not an Ameriprise product—facts of which the Mosleys and the Fellows were aware. The sale of Wex Wheels assignments did not require access to a stock exchange or other market through Ameriprise, and the assignments were not the kind of investment for which a customer typically relies on a broker with access through his firm to a stock exchange. The Mosleys and the Fellows never received an Ameriprise statement indicating that Wex Wheels was condoned by Ameriprise, and they did not place their money with Davis for investment in markets to which Davis had access only by reason of his relationship with Ameriprise. In fact, the Mosleys were not Ameriprise investment clients and never made a single investment with Ameriprise. Furthermore, Davis told the Mosleys and the Fellows that Wex Wheels was not an Ameriprise product, and Fred

16

Fellows told Davis that this was what he found "attractive" about Wex Wheels. In short, neither the Mosleys nor the Fellows relied on Davis's relationship with Ameriprise to gain access to the Wex Wheels assignments, Davis did not rely on Ameriprise to promote these investments, and neither the Mosleys nor the Fellows based their decision to invest in Wex Wheels on the fact that Davis was affiliated with Ameriprise. Rather, the record establishes that the assignments were separate arrangements between Davis and the Mosleys and between Davis and the Fellows. Lastly, Ameriprise had no knowledge of, or financial interest in, Wex Wheels.

¶28  A broker-dealer "is not an insurer of its representatives." *Hauser*, 14 F.3d at 1341. On the facts and evidence presented here, we conclude that Ameriprise was not a "control person" of Davis with respect to the Mosleys' and the Fellows' purchases of Wex Wheels assignments. It appears that Davis was engaged in these sales as an entirely distinct and separate venture from his employment with Ameriprise. Given this conclusion, we hold that irrespective of whether the jury was adequately instructed on the meaning of "control person," the Mosleys' and the Fellows' control-person liability claims against Ameriprise fail as a matter of law. This holding, in turn, renders moot the remaining issues raised by the Mosleys and the Fellows and by Ameriprise.

## CONCLUSION

¶29  The District Court did not err in dismissing the Mosleys' and the Fellows' 30-10-202 claim against Davis based on his statute-of-limitations defense. Ameriprise was not liable as a "control person" of Davis with respect to the Mosleys' and the Fellows' purchases of unregistered securities.

¶30    Affirmed.


                                              /S/ JAMES C. NELSON



We Concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JIM RICE