OP 11-0558

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 144A

BILLIE L. REDDING,

        Petitioner,

  v.

MONTANA FIRST JUDICIAL DISTRICT COURT,
THE HONORABLE DOROTHY McCARTER,
Presiding,

        Respondent.

ORIGINAL PROCEEDING: Writ of Supervisory Control
In and For the County of Lewis & Clark, Cause No. ADV 09-649
Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

        For Petitioner:

                Linda M. Deola (argued), Morrison, Motl & Sherwood, PLLP, Helena, MT

        For Respondent:

                P. Brad Condra (argued), G. Patrick HagEstad (argued), Milodragovich, Dale, Steinbrenner & Nygren, P.C., Missoula, MT

        For Amicus:

                Jesse Laslovich, Jameson C. Walker, Brett O'Neil, Office of the Commissioner of Securities and Insurance, Helena, MT

Argued: April 25, 2012
Submitted: April 26, 2012
Decided: July 5, 2012
Amended: July 6, 2012

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1    Petitioner Billie L. Redding (Redding) asks this Court, pursuant to M. R. App. P. 14, to exercise supervisory control over the First Judicial District Court, Lewis and Clark County, and to conclude it was error for the District Court to grant partial summary judgment to Defendants Timothy Janiak; Anderson ZurMuehlen & Co., P.C.; Ray E. Petersen; and Rick Ahmann (collectively "AZ").

## BACKGROUND

¶2    For the purposes of this Opinion, the facts are not materially disputed. Redding is a 76 year old widow[1] with a high school education.  Redding worked the majority of her adult life on family ranches.  In 2004, Redding sold her ranch for approximately 3.3 million dollars.  Seeking to avoid tax liability on the sale, and provide income for life for herself and her son, Redding sought advice from her accountant, Timothy Janiak (Janiak).

¶3    Janiak, a Certified Public Accountant (CPA), had been Redding's accountant for approximately 20 years and was a shareholder at the accounting firm Anderson ZurMuehlen & Co. ("Anderson").  Janiak assisted Redding in the sale of her ranch, and Redding sought his advice to invest the proceeds of the sale.  To help Redding achieve her financial goals, Janiak steered Redding to a company called Anderson ZurMuehlen Real Estate and Business Brokerage, LLC, d/b/a Acquiron.

---

[1] During the events leading up to the lawsuit, Redding was in her late 60s and early 70s.

¶4 Acquiron was a subsidiary of Anderson, formed with Rick Ahmann (Ahmann), a real estate broker. Ray E. Petersen (Petersen), a CPA and former shareholder at Anderson, was Anderson's representative in Acquiron. Acquiron sold Tenants-In-Common investments (TICs) to clients of Anderson. A TIC investment is, generally speaking, a joint investment in real property, in this case commercial property, where each owner owns an undivided share of the property. The TICs involved in Redding's case were initially owned by DBSI Housing, Inc. (DBSI) or one of its hundreds of affiliates.[2]

¶5 DBSI would acquire title to real property then sell the same property in shares to a number of investors. DBSI would then require the new owners to execute several agreements, including a lease agreement with DBSI in which the owners leased the property back to DBSI as "master tenant," and a TIC agreement with the other owners. The owners also assumed a pro rata share of the debt DBSI incurred in acquiring the real property.

¶6 DBSI, as "master tenant," would then lease the properties to commercial tenants, acting as a property manager for the owners. DBSI would pay the expenses of operating each property. According to the "NNN Plus Lease" summary provided by DBSI to potential investors, Redding and the other owners did not have to invest "the personal time and effort involved in operating the property and in dealing with multiple tenants."

---

[2] In a statement made by DBSI through its bankruptcy attorneys, it acknowledges that it has "hundreds of companies" as affiliates. For simplicity, we will refer to DBSI only, although several affiliated entities, including FOR 1031, are involved in this case.

Rather, as DBSI advertized, "the management responsibilities of the TICs will simply consist of dealing with the NNN PLUS Lessee and receiving and depositing a monthly lease payment from the Lessee."

¶7    In return for the owners' investment, DBSI promised a 6% - 7% per year rate of return on each owner's investment, with annual increases of approximately 3%. These promised returns were from the lease payments DBSI collected on the properties. DBSI would keep any profits above the promised rate of return to investors.

¶8    Ultimately, Redding purchased four DBSI TICs via 1031 exchanges in 2004.[3] The 1031 exchanges allowed Redding to avoid tax liability on the sale of her ranch, and, in theory, the newly purchased properties would provide the income she sought. Redding's purchases were brokered by Acquiron. Using the proceeds of the ranch sale and other assets, Redding paid approximately $4.6 million for the properties, which includes approximately $2.2 million cash and $2.4 million of assumed debt on the properties.

¶9    DBSI's scheme collapsed and it stopped making payments to investors in 2008, and filed for bankruptcy. In response to petitions from the states of Idaho and Montana, the bankruptcy court appointed an examiner to investigate the finances of DBSI and its various affiliates. The examiner found that DBSI was running a Ponzi scheme.[4]

---

[3] A 1031 exchange is named after § 1031 of the Internal Revenue Code, or 26 U.S.C. § 1031. This section allows, with some exceptions, an individual to avoid paying taxes on the sale of "property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment." 26 U.S.C. § 1031(a)(1).
[4] We have defined a Ponzi scheme as "a fraudulent investment arrangement in which returns to investors are not paid from any "profits" of an underlying business venture, but from monies obtained from later investors. The fraud consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists

¶10 In a related complaint brought by the bankruptcy trustee against DBSI's Idaho attorneys, the trustee alleged that, "[i]n November 2008 . . . [t]ens of thousands of [DBSI] investors learned that they had lost everything. The docket of the Bankruptcy Court is crowded with letters from individual investors telling of lost savings accumulated in some cases through the efforts of generations."

¶11 After the colossal collapse of DBSI, Redding sued AZ in 2009[5] alleging: (1) unlawful sale of securities; (2) negligence; (3) negligent misrepresentation; (4) breach of fiduciary duty; (5) breach of contract; and (6) tortious breach of the covenant of good faith and fair dealing. Redding sought damages in the amount of $4,635,485.51, plus additional amounts for punitive damages, emotional distress, loss of established course of life, and consequential damages.

¶12 Redding moved for summary judgment on several issues, however the only issue relevant here is "[w]hether or not the DBSI TICs sold to [Redding] are securities under the Securities Act of Montana[.]" AZ also moved for summary judgment on the same issue. After briefing, the District Court found the DBSI TICs were not securities under Montana law. In an August 9, 2011, order, the District Court found that "Redding did not engage in a common enterprise," an essential element of an investment contract (i.e. a security), because she "did not share the risks of the investment with other investors

---

and inducing further investment. As a result of the absence of sufficient (or any) assets able to generate funds necessary to pay the promised returns, the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse." *Mosley v. American Express Financial Advisors, Inc.*, 2010 MT 78, ¶ 3 n. 1, 356 Mont. 27, 230 P.3d 479. DBSI denies it ran a Ponzi scheme.
[5] Her complaint was amended three times. These allegations are from the Third Amended Complaint.

because she agreed upon a contractually set return on her investment." The District Court stated the "keystone" of a common enterprise is "risk and fluctuation with the return on the investment." Because Redding "wanted 'zero risk[,]' " the District Court found the TICs were not securities under Montana law.

¶13 On September 23, 2011, Redding filed her Petition for Writ of Supervisory Control ("Petition"). AZ moved to stay the proceedings in District Court, pending the outcome of Redding's Petition. The District Court granted AZ's motion over Redding's objection. Redding's Petition presents one issue, we restate as follows:

¶14 *Did the District Court err in holding that the TICs at issue are not securities under the Securities Act of Montana?*

## DISCUSSION

¶15 Before reaching the merits of Redding's Petition, we must determine whether the exercise of supervisory control is appropriate.

### A. Is Supervisory Control Appropriate?

¶16 By virtue of Article VII, Section 2(2) of the Montana Constitution, this Court has "general supervisory control over all other courts." *Stokes v. Montana Thirteenth Judicial District Court*, 2011 MT 182, ¶ 5, 361 Mont. 279, 259 P.3d 754. Supervisory control is an extraordinary remedy, reserved for extraordinary circumstances. *Stokes*, ¶ 5. We consider the propriety of supervisory control on a case-by-case basis. *Stokes*, ¶ 5.

¶17 Rule 14(3) of the Montana Rules of Appellate Procedure governs petitions for writs of supervisory control:

The supreme court has supervisory control over all other courts and may, on a case-by-case basis, supervise another court by way of a writ of supervisory control. Supervisory control is an extraordinary remedy and is sometimes justified when urgency or emergency factors exist making the normal appeal process inadequate, when the case involves purely legal questions, and when one or more of the following circumstances exist:
(a) The other court is proceeding under a mistake of law and is causing a gross injustice;
(b) Constitutional issues of state-wide importance are involved;
(c) The other court has granted or denied a motion for substitution of a judge in a criminal case.

¶18 "This Court will assume supervisory control of a district court to direct the course of litigation where the district court is proceeding based upon a mistake of law, which if uncorrected, would cause significant injustice for which an appeal is an inadequate remedy. *Truman v. Montana Eleventh Judicial District Court*, 2003 MT 91, ¶ 13, 315 Mont. 165, 68 P.3d 654. Judicial economy and inevitable procedural entanglements are appropriate reasons to exercise supervisory control where a mistake of law will affect virtually all aspects of the case: the costs, the course of discovery, settlement negotiations, and the trial itself. *Truman*, ¶ 15; *Stokes*, ¶ 6. In such cases, any verdict rendered would be "questionable" and would inevitably lead to further costs and litigation. *Truman*, ¶ 15.

¶19 Redding argues that supervisory control is appropriate because the District Court's order is a clear mistake of law, and is in direct conflict with the precedent of the United States Supreme Court and the opinions of the Montana Commissioner of Securities and Insurance, the Securities Exchange Commission (SEC), and the Financial Industry Regulatory Authority (FINRA) (formerly known as National Association of Securities

7

Dealers (NASD)). If allowed to stand, Redding argues the ruling will create an "environment ripe for securities fraud" in Montana, and supervisory control is required to prevent significant injustice to Redding and all citizens of Montana.

¶20 AZ appeared for the District Court, and argues that supervisory control is inappropriate because the appeal process is an adequate remedy. At oral argument, AZ also argued that exercising supervisory control in this case will "open the floodgates" of interlocutory appeals and lead to the granting of innumerable petitions for writs of supervisory control.

¶21 We first address AZ's "floodgate" argument. AZ is simply incorrect, as this Court's publicly available statistics show.[6] In 2011, 58 petitions for writs of supervisory control were filed; 7 were granted. The highest number of granted petitions for writs of supervisory control in recent years was 12 out of 50 in 2009. The lowest number (in the publicly available statistics) was 1 out of 33 in 2006. The floodgates have simply not opened. This argument is entirely without merit.

¶22 On the merits of Redding's petition, we find that exercising supervisory control is appropriate in this case. There appear to be no facts in dispute that are material to the contested legal issue—whether the TICs constitute securities under Montana law. Like *Truman*, *Stokes*, and other cases in which we have exercised supervisory control, this is an issue of law that drives how the case proceeds through trial. Resolution of the issue

---

[6] These statistics are available to all members of the public here: http://courts.mt.gov/clerk/stats/default.mcpx. Simply click on the heading "Original Proceedings Detail – 2011." Statistics for the years 2004-2010 are also available from this page.

8

will avoid the "costs and delay associated with the full re-trial almost certain to result if the district court's interpretation of the statute is set aside." *Stokes*, ¶ 8. If incorrect, the District Court's ruling would deny Redding, and others similarly situated,[7] the protections of the Securities Act of Montana. Redding's cause of action for unlawful sale of securities would be forfeited, along with the specific remedies that accompany such a claim, including rescission and damages allowable under the Act. This in turn would affect all aspects of Redding's remaining case. We conclude that the District Court's ruling would cause a significant injustice for which an appeal is an inadequate remedy, and that justice requires this Court to exercise supervisory control.

**B. Did the District Court err in holding that the TICs at issue are not securities under the Securities Act of Montana?**

¶23 The Securities Act of Montana, § 30-10-101, MCA, et. seq. (the Act), regulates the sale of securities to the citizens of Montana. A primary goal of the Act is to "protect the investor, persons engaged in securities transactions, and the public interest[.]" Section 30-10-102(1), MCA. The Act is heavily based on its federal counterparts, the Securities Act of 1933 and the Securities Exchange Act of 1934. The fundamental purpose of those acts is "to eliminate serious abuses in a largely unregulated securities market." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849 (1975).

¶24 The Act defines "security" quite broadly. Section 30-10-103(22), MCA; *State v. Duncan*, 181 Mont. 382, 393, 593 P.2d 1026, 1033 (1979). Such a broad definition is in

---

[7] According to the Montana Commissioner of Securities and Insurance, there are "at least eighty Montana [DBSI] investors with and [sic] aggregate investment of at least $32 million."

harmony with federal securities law, which recognizes "the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits[.]' " *Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990). Congress "determined that the best way to achieve its goal of protecting investors was to define the term 'security' in sufficiently broad and general terms so as to . . . encompass virtually any instrument that might be sold as an investment." *Reves*, 494 U.S. at 61 (internal citations and quotations omitted).

¶25 Under the Act, securities include "investment contract[s]." Section 30-10-103(22)(xii), MCA. Under Montana law, an "investment contract" is " 'an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.' " *Duncan*, 181 Mont. at 392-93, 593 P.2d at 1032-33 (quoting *Forman*, 421 U.S. at 852). In order to be considered an investment contract (and thereby a security) under the Act, the following elements must be met:

    1) an investment;
    2) in a common venture;[8]
    3) with reasonable expectation of profits;
    4) derived through the entrepreneurial or managerial efforts of others.

*Duncan*, 181 Mont. at 392, 593 P.2d at 1032.

¶26 Only two elements are at issue in this case – common venture and entrepreneurial or managerial efforts of others. The parties do not dispute that Redding has satisfied both

---

[8] This element has also been referred to as "common enterprise."

10

the investment and reasonable expectation of profits elements. We address each of the disputed elements in turn.

### 1. Common Venture

¶27 Commonality can be established several ways. Some courts use the horizontal commonality approach, while others use a form of vertical commonality. The federal circuit courts are currently split on which form of commonality is the best approach. We will discuss each below.

¶28 Horizontal commonality focuses on the relationship between the investors. It is "the 'pooling' of investors' funds as a result of which the individual investors share all the risks and benefits of the business enterprise." *SEC v. ETS Payphones, Inc.*, 300 F.3d 1281, 1284 (11th Cir. 2002), *rev'd on other grounds*, *SEC v. Edwards*, 540 U.S. 389 (2004).[9] The Third Circuit describes horizontal commonality as "pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors." *SEC v. Infinity Group Co.*, 212 F.3d 180, 188 (3rd Cir. 2000). The First Circuit has "endorsed" the suggestion that "Ponzi schemes typically satisfy the horizontal commonality standard." *SEC v. SG, Ltd.*, 265 F.3d 42, 51 (1st Cir. 2001).

¶29 Vertical commonality focuses on the relationship between the investor and the promoter of the investment. It takes two forms – either broad or narrow. Broad vertical commonality requires "that the investors are dependent upon the expertise or efforts of

---

[9] Contrary to AZ's assertion that the Eleventh Circuit has adopted the horizontal commonality approach, the very next paragraph of its opinion in *ETS Payphones* states "we are bound by precedent to apply a different test for commonality, 'broad vertical commonality.'" *ETS Payphones*, 300 F.3d at 1284.

the investment promoter for their returns." *ETS Payphones*, 300 F.3d at 1284. Narrow vertical commonality, as adopted by the Ninth Circuit, requires that "the fortunes of investors are interwoven with and dependent upon the efforts and success of those seeking the investment or third parties." *Hector v. Wiens*, 533 F.2d 429, 433 (9th Cir. 1976). Under narrow vertical commonality, "where an investor's avoidance of loss depends on the promoter's 'sound management and continued solvency,' a common enterprise exists." *SEC v. Eurobond Exchange, Ltd.*, 13 F.3d 1334, 1340 (9th Cir. 1994).

¶30 The United States Supreme Court has not settled this split amongst the circuits. *See Mordaunt v. Incomco*, 469 U.S. 1115 (1985) (Burger, C.J., and White and Brennan, J.J., dissenting from denial of certiorari); *SG, Ltd.*, 265 F.3d at 49 (discussing the "disarray as to the legal rules associated with the ascertainment of a common enterprise.").

¶31 Montana has not expressly adopted any of these tests for common venture. We have found that when income to the investors depends upon the "common enterprise" selling a final product, a common venture exists. *Duncan*, 181 Mont. at 391, 593 P.2d at 1032. In other words, the common venture element is met when return on an investment is dependent on the efforts of the "enterprise" to generate it. *Duncan*, 181 Mont. at 391, 593 P.2d at 1032. This appears to be broad vertical commonality.

¶32 This case requires us to adopt a method for determining what fulfills the common venture requirement. In doing so, we keep in mind that one of the foremost purposes of the Act is to protect the investing public. *See Knowles v. State ex rel. Lindeen*, 2009 MT

415, ¶ 1, 353 Mont. 507, 222 P.3d 595.   We also keep in mind the remedial purposes behind the Act, which require the Act to be broadly construed to effectuate its purpose. *Duncan*, 181 Mont. at 393, 593 P.3d at 1033.   Finally, we again note the need for flexibility to address "the virtually limitless scope of human ingenuity" to devise ever more complex schemes of using others' money on the promise, many times an illusory one, of profits. *Reves*, 494 U.S. at 60-61.

¶33   With these premises in mind, we conclude that for the purposes of the Act, a common venture can be established by satisfying the elements of any of the above discussed methods – either horizontal, broad vertical, or narrow vertical commonality. This approach best satisfies the purposes of the Act and will allow for flexibility to address any manner of new-fangled schemes.

¶34   We now turn to the District Court's finding that no common venture existed "between Redding and DBSI."  It found that "[e]xamining the three different methods of common enterprise [horizontal, and broad and narrow vertical commonality] reveals that the keystone is for risk and fluctuation with the return on the investment."  Because Redding "did not share the risks of the investment with other investors because she agreed upon a contractually set return on her investment[,]" the District Court found horizontal commonality was not met.  Vertical commonality was not met because the District Court found "Redding was set to collect a contractually agreed upon return whether it was a month in which DBSI collected an abundance of rent or a month with

very little rent." In sum, because DBSI promised Redding a certain amount of income, no common venture existed, and therefore the TICs could not be securities.

¶35 The District Court's legal conclusions regarding common venture are in conflict with United States Supreme Court precedent and simply incorrect. In *Edwards*, the United States Supreme Court was tasked with deciding "whether a moneymaking scheme is excluded from the term 'investment contract' simply because the scheme offered a contractual entitlement to a fixed, rather than variable, return." *Edwards*, 540 U.S. at 391. The Court unanimously held that "an investment scheme promising a fixed rate of return can be an 'investment contract' and thus a 'security' subject to federal securities laws." *Edwards*, 540 U.S. at 397. Any other holding would allow "unscrupulous marketers of investments [to] evade the securities laws by picking a rate of return to promise." *Edwards*, 540 U.S. at 394-95. The Court also noted that "investments pitched as low-risk (such as those offering a 'guaranteed' fixed return) are particularly attractive to individuals more vulnerable to investment fraud, including older and less sophisticated investors." *Edwards*, 540 U.S. at 394. The District Court's reliance on a promised rate of return as dispositive of common venture (and thus dispositive of security) was error and must be reversed.

¶36 Contrary to the District Court's analysis, the "keystone" regarding common venture is not "risk and fluctuation with the return on the investment." It is the relationship between either the investors themselves (horizontal commonality) or the investors and the promoter or third parties (vertical commonality) that is crucial. For

14

horizontal commonality, a court must consider whether (1) the investors' assets were "pooled," and (2) whether the investors shared in the profits and losses of the enterprise on a pro-rata basis (i.e. proportionate to each investor's contribution). *SG, Inc.*, 265 F.3d at 50-51; *Infinity Group*, 212 F.3d at 188-89.

¶37     For broad vertical commonality, a court must consider whether the investors' profits (the return on investment)[10] are dependent upon the expertise or efforts of the promoter. *ETS Payphones*, 300 F.3d at 1284.  The thrust of this test is "that the investors have no desire to perform the chores necessary for a return[,]" but rather depend upon the efficacy of the promoter for the return on the investment.  *SEC v. Unique Financial Concepts, Inc.*, 196 F.3d 1195, 1199-1200 (11th Cir. 1999).

¶38     Finally, for narrow vertical commonality, a court must consider whether the investors' fortunes are interwoven with and dependent upon the efforts *and success* of the promoter or a third party.  *Brodt v. Bache & Co.*, 595 F.2d 459, 460 (9th Cir. 1978); *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n. 7 (9th Cir. 1973) (emphasis added).   Here, more is required than just a link between investor profits and the *efforts* of the promoter.  Narrow vertical commonality requires the success or failure of the investor to be linked to the success or failure of the promoter – "there is no common enterprise unless there is some direct relation between the success or failure of the promoter and that of his investors."  *Mordaunt v. Incomco*, 686 F.2d 815 (9th Cir. 1982), *cert. denied*,

---

[10] In *Edwards*, the United States Supreme Court made clear that profits under the "investment contract" analysis mean "the profits that investors seek on their investment, not the profits of the scheme in which they invest." *Edwards*, 540 U.S. at 394.

469 U.S. 1115 (1985). Neither vertical commonality approach requires pooling of investor funds or sharing of profits and losses on a pro-rata basis. *Unique Financial Concepts*, 196 F.3d at 1199 n. 4.

¶39    Turning to the present case, we conclude DBSI's TIC investment scheme was a common venture under any measure. We first analyze horizontal commonality, and find that both elements are present. There is no question here that investor funds were pooled. The resources of several investors, including Redding, were pooled to purchase a given property, and each investor owned a certain percentage of the property based upon the amount invested. There is also no question that the investors each shared in the profits and losses according to their contribution to the investment. If the investment made money, each investor received a rate of return (6% or 7% per year, plus an annual 3% increase) on their pro-rata share of the investment. Likewise, each investor stood to lose some or all of their pro-rata share of the investment should the venture fail. The fact that Redding was promised a certain percentage return and still owns her interest in some of the properties does not mean she stood to lose nothing. To conclude otherwise ignores the reality of what Redding and others who invested with DBSI face – some or all of their investments are now essentially worthless. These two things – the pooling of assets and the pro-rata sharing of profit or loss – are all that is required for horizontal commonality. *SG, Inc.*, 265 F.3d at 50-51; *Infinity Group*, 212 F.3d at 188-89. DBSI's scheme meets both, thus there was a common venture. Additionally, we note that because DBSI was

16

allegedly a Ponzi scheme, that alone may also satisfy horizontal commonality. *SG, Ltd.*, 265 F.3d at 51.

¶40    We next analyze broad vertical commonality.  Again, there is no question that investors' returns were dependent upon the expertise or efforts of DBSI.  It is clear from the lease agreement that DBSI was to do all the "chores necessary for a return." *Unique Financial Concepts*, 196 F.3d at 1199-1200.  Redding simply purchased her shares in the property, and indeed was *required* to lease the property back to DBSI as "master tenant" and property manager.  She did not invest "the personal time and effort involved in operating the property and in dealing with multiple tenants."  Redding and the other investors had no responsibility to generate any profit; that was DBSI's job as "master tenant."  The investors gave DBSI money, and in return it was DBSI that promised to generate profit.  It was up to DBSI to secure tenants for the property, and it was the rent generated from these tenants that provided the return to Redding and other investors.  Without DBSI's effort and expertise renting and managing the property, the investors would get no return.  Thus, broad vertical commonality is satisfied.

¶41    Finally, we analyze narrow vertical commonality.  For essentially the same reasons broad vertical commonality exists, narrow vertical commonality also exists.[11]  It is obvious that there is a direct relation between the success or failure of DBSI and the success or failure of Redding and the other investors.  If DBSI did not rent and manage

---

[11] We also note that once narrow vertical commonality is satisfied, it appears broad vertical commonality would also be satisfied in virtually every case.  However the two are interrelated, one is not dependent on the other and either can satisfy the common venture element.

the property successfully, the investment would fail - the investors' avoidance of loss was dependent on DBSI's sound management and continued solvency. AZ acknowledges as much, stating "almost every lessee such as Redding is reliant upon the commercial lessor's [DBSI's] ability to manage the property." While AZ is correct that this alone does not make the TICs in question securities, it does satisfy narrow vertical commonality.

¶42 We conclude that the TICs in question were common ventures under any commonality analysis. Therefore, we proceed to analyze the fourth prong of the *Duncan* test - the entrepreneurial or managerial efforts of others.

## 2. Entrepreneurial or Managerial Efforts of Others

¶43 *Duncan* requires that the profits expected in prong 3 of the test be "derived through the entrepreneurial or managerial efforts of others." *Duncan*, 181 Mont. at 392, 593 P.2d at 1032. This differs from the United States Supreme Court's *Howey* test, where the profits were to derive "solely from the efforts of the promoter or third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Montana has not required rigid conformity with the "solely" requirement. Indeed, "solely" was purposefully left out of our test. *Duncan*, 181 Mont. at 392, 593 P.2d at 1032 (discussing criticism of the requirement and the language used by the United States Supreme Court in *Forman* which "effectively deletes the strict 'solely' requirement from the test."). The Circuit Courts of Appeal have also declined to "give literal meaning to the word 'solely' in this context[.]" *SG, Ltd.*, 265 F.3d at 55. Therefore, the requirement that profits be derived from the

entrepreneurial or managerial efforts of others is generally satisfied so long as " 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.' " *SG, Ltd.*, 265 F.3d at 55 (quoting *Turner Enterprises*, 474 F.2d at 482.).

¶44    Before we analyze this element, it must be noted that the TICs in question in Redding's case are "affiliate TICs" meaning that the investors purchased the property from DBSI and leased it back to DBSI, or a DBSI affiliate, who served as the "master tenant." These differ from "non-affiliate TICs" where investors purchase the property from a promoter then contract with a property or asset manager who is not the promoter, nor an affiliate of the promoter to operate the investment. In a non-affiliate TIC investment, the promoter's role ends upon the completion of the purchase. The "efforts of others" analysis for non-affiliate TICs may differ from the analysis here. *See* David Rich, Student Author, *Betting the Farm: The TIC Turf War and Why TICs Constitute Investment Contracts Under Federal Securities Laws*, 1 Wm. & Mary Bus. L. Rev. 451 (2010). Circuit Courts of Appeal have looked to both pre-purchase efforts (of the promoter) and post-purchase efforts (of the third party property or asset manager) to satisfy this prong of the *Howey* test, reaching differing conclusions. *See SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996) (pre-purchase efforts alone will not suffice; absent substantial post-purchase efforts by promoter or a third party, this prong is not met), *compare with SEC v. Mutual Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005) (efforts of others may be satisfied by pre- or post-purchase efforts of the promoter or third party).

Because DBSI was both the promoter and the property manager, we need not engage in this analysis.

¶45    The focus in this case is on the amount of control retained by Redding and the other investors and whether or not that control was illusory.  Not surprisingly, the Circuit Courts of Appeal are split on this issue.  The Eleventh and Fifth Circuits look to the written agreements between the parties.  *Albanese v. Florida National Bank of Orlando*, 823 F.2d 408 (11th Cir. 1987); *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981).  The Eleventh Circuit has found "the crucial inquiry is the amount of control that the investors retain under their written agreements."  *Albanese*, 823 F.2d at 410 (citing *Williamson*, 645 F.2d at 423-24.).  "If the investor retains the ability to control the profitability of his investment, the agreement is no security."  *Albanese*, 823 F.2d at 410.  However, even if the written agreement offers substantial control to the investor, if that control is illusory, the "efforts of others" element can still be met.  *Albanese,* 823 F.2d at 412.

¶46    In contrast, the Second Circuit looks to the "reality of the parties' positions" and evaluates "whether 'the reasonable expectation was one of significant investor control.' " *United States v. Leonard*, 529 F.3d 83, 85 (2d Cir. 2008).  If there is a reasonable expectation of significant investor control, the protection of securities laws is not needed. *Leonard*, 529 F.3d at 88.  It is for the "passive investor" that the securities laws were enacted.  *Leonard*, 529 F.3d at 88; *SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 585 (2d Cir. 1982).  Thus, despite what the written agreements say on their face, if the promoter sought out and expected passive investors, this element may be met.  *Aqua-*

*Sonic*, 687 F.2d at 584. Under this approach, " '[w]hat matters more than the form of an investment scheme is the "economic reality" that it represents. The question is whether an investor, as a result of the investment agreement itself *or the factual circumstances that surround it*, is left unable to exercise meaningful control over his investment.' " *Leonard*, 529 F.3d at 90 (quoting *Robinson v. Glynn*, 349 F.3d 166, 170 (4th Cir. 2003)) (emphasis in *Leonard*).

¶47 The District Court did not make any findings on this issue because it concluded "DBSI providing essential managerial efforts is irrelevant because Redding did not invest in a common enterprise." However, the issue was briefed by the parties. Redding argued that this element was met. AZ argued that Redding could not meet this element because Redding retained the rights to (1) "terminate DBSI as the master tenant;" (2) "sell the property;" (3) re-enter "the leased premises for the purpose of making inspections, repairs, alterations or additions as the Tenant in Common group might deem necessary;" and (4) a "lien against DBSI for rent damages or other payments." Further, AZ argued that Redding was expected to "engage in conference calls, sign documentation and participate in assessing DBSI's performance as the Master Tenant." AZ argued that Redding exercised this control by participating in at least one conference call, and more importantly, terminating DBSI as "master tenant" on two properties. Finally, AZ argued that Redding did not look to DBSI to produce profits, but rather to the property itself.

¶48 We are not persuaded by AZ's arguments. We agree with the reasoning of the Second and Fourth Circuits, and we will look to the "economic reality" of the situation

21

and the investor's ability to *meaningfully* control the investment. *Leonard*, 529 F.3d at 89-90; *Robinson*, 349 F.3d at 170. We will not confine this inquiry to a review of the organizational documents alone, but rather inquire into the amount of actual control the investor was expected to exercise *in reality*. *Leonard*, 529 F.3d 89-90. This approach best serves the purposes of the Act, and will allow for the flexibility required to adapt to the ever evolving schemes "devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299. Again, the question is " 'whether [the] investor, as a result of the investment agreement itself *or the factual circumstances that surround it*, is left unable to exercise meaningful control over his [or her] investment.' " *Leonard*, 529 F.3d at 90 (quoting *Robinson*, 349 F.3d at 170) (emphasis in *Leonard*).

¶49    In Redding's case, we conclude that in reality DBSI sought out passive investors and that Redding, regardless of the rights she retained in the written agreements, was not expected to exercise any meaningful control over her investment, nor did she expect to exercise meaningful control over her investment. Indeed, AZ acknowledges that "Redding did not want to directly manage the day to day affairs of any property she would purchase." Nothing better illustrates Redding's lack of managerial control than the "NNN Plus Lease" summary, declaring that Redding and the other owners did not have to invest "the personal time and effort involved in operating the property and in dealing with multiple tenants." Rather, as DBSI advertized, "the management responsibilities of the TICs will simply consist of dealing with the NNN PLUS Lessee and receiving and depositing a monthly lease payment from the Lessee." Additionally,

22

that Redding played no role in "shaping the organizational agreements" casts doubt as to whether she was expected to have significant control over the enterprise. *Leonard*, 529 F.3d at 90. Moreover, the parties do not dispute that, other than her ranch, Redding had no experience in owning and managing commercial properties. AZ does not point to any facts in the record that would suggest Redding's practical ability to take over and manage four large commercial properties. *Leonard*, 529 F.3d at 90. And while Redding and the other investors terminated DBSI as "master tenant" on two of the properties,[12] it can hardly be said that the investors were *expected* to do so. The expectations were just the opposite – DBSI was to directly manage the day to day affairs of the property for Redding. That was the entire point of the written agreements between Redding and DBSI. Terminating DBSI once it was in default is not meaningful control of the property or the investment.

¶50  Even were we to accept AZ's argument that Redding had the ability to control her investment via certain rights retained under the written agreements, a review of the documents themselves shows that any control Redding was granted under the documents was not meaningful, but was illusory. AZ makes much of the fact that Redding could terminate DBSI as "master tenant." However, the process to terminate DBSI was nearly impossible. Redding alone could not terminate DBSI. A majority vote of all the owners was required. Then, termination was "effective only when" DBSI was relieved from all obligations to the property and "indemnified by a majority in percentage ownership . . .

---

[12] AZ acknowledges that Redding lost her interest in two of the properties.

23

against any and all claims, actions, costs, damages, liabilities, deficiencies or expenses" relating to the property. Additionally, to sell the property or hire a new property manager, a unanimous vote of all the owners was required. A TIC can have as many as 35 owners,[13] none necessarily residing in the same geographic area, and any one owner could thwart the others' attempt to sell the property or hire a new property manager. This does not demonstrate that Redding had meaningful control over her investment. As for the right of re-entry and the right to a lien against DBSI, these rights do not evidence a meaningful right to control the profitability of her investment, nor does signing documents and participating in one conference call.

¶51　　We conclude that the efforts made by DBSI are the undeniably significant ones – the essential managerial efforts which affect the failure or success of the enterprise. *SG, Ltd.*, 265 F.3d at 55. The written documents themselves indicate that Redding was not expected to exercise any meaningful control over her investment, nor did AZ present evidence that she expected to exercise meaningful control over her investment. Because DBSI's efforts were the significant ones, Redding was dependent on DBSI's entrepreneurial and managerial efforts to generate profit. The final element of the *Duncan* test is met.

### 3.　Were the TICs Securities in 2004?

¶52　　Finally, we address AZ's argument that the TICs were not securities in 2004. AZ argues repeatedly that a security "exists at the time it is sold or not at all," hence because

---

[13] Rev. Proc. 2002-22, § 6.02, 2002-1 C.B. 733.

the TICs were not securities in 2004, they cannot be securities now. To support this argument, AZ states that "guidance from the IRS [Rev. Proc. 2002-22, 2002-1 C.B. 733] showed that these properties were not securities and there was no guidance from the SEC on the subject[.]" AZ, however, has not shown that in 2004 the IRS, or anyone else, believed that TICs were *not* securities. Rev. Proc. 2002-22 simply provides guidance for TIC sponsors and owners to avoid having TICs classified as partnerships. It does not say TICs are not securities.

¶53    In fact, materials which AZ submitted in its Table of Appendices on appeal and upon which AZ relied for its contention that the TICs here were not securities in 2004, actually establish that these TICs *would have been considered securities in 2004*, under the circumstances presented here. The September 2004 Moffat Thomas opinion letter directed to FOR 1031 LLC (a DBSI affiliate), addressing the question of whether a TIC constituted a security under federal law as of 2004, was submitted to the District Court by AZ when it moved for summary judgment. The letter exhaustively analyzes the case law as of 2004 on the security question. Repeatedly, the opinion letter states that as long as the investor in question is experienced and knowledgeable in owning and operating developed income-producing property – and certain other factors are met – it can be assumed that the TICs are not securities. Summarizing *Williamson v. Tucker*, the opinion letter states:

>    [T]he [*Williamson*] court concluded the venture would not involve a
> security *unless* the plaintiffs could show that . . . (2) the partner or venturer
> is so inexperienced or unknowledgeable in business affairs that he or she is

25

incapable of intelligently exercising his or her partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or management ability of the promoter or manager that he or she cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers." [Emphasis added.]

¶54 It is undisputed that Redding had no experience in or knowledge concerning the operation of developed income-producing property. Further, she had no meaningful partnership powers, as we explain in ¶¶ 49-51. Therefore, under the language lifted from AZ's tendered authority, it is clear that as of 2004, these circumstances would have compelled a finding that this transaction qualified as a security transaction. Further buttressing this conclusion is one of AZ's own experts, who was employed by "a major TIC sponsor who sold TICs as a security" in May of 2004, several months prior to the time Redding purchased her TICs. Given these facts, we do not accept AZ's argument that the TICs were not securities in 2004.

¶55 Our holding that the TICs are securities is based on the documents Redding reviewed and executed in 2004, the contents of which have not changed, and the facts and circumstances surrounding the transactions. The TICs Redding purchased were securities in 2004.

## CONCLUSION

¶56 Based on the tests and principles of law discussed above, the TICs here are securities.

¶57 Therefore, IT IS HEREBY ORDERED that Redding's Petition for Writ of Supervisory Control is GRANTED.

26

¶58    IT IS FURTHER ORDERED that the District Court's August 9, 2011, Order granting partial summary judgment to AZ is REVERSED.  We remand this case to the District Court for entry of partial summary judgment in favor of Redding on the question of whether the TICs sold to Redding are securities under the Securities Act of Montana, and for further proceedings consistent with this Opinion.

¶59    The Clerk of Court is directed to provide copies of this Opinion to all counsel of record; The Hon. Dorothy McCarter; and to Monica J. Lindeen, Montana Commissioner of Securities and Insurance.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS
/S/ JIM RICE

27